PAULA E., Appellant,

v.

STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, Appellee.

No. S–14247.

Supreme Court of Alaska.

May 8, 2012.

**26.** *Id.* at 198 (citing *Silvan v. Alcina,* 105 P.3d 117, 121 (Alaska 2005)).

Melanie Baca Osborne and Kirsten M. Kinegak–Friday, Stoel Rives LLP, Anchorage, for Appellant.

Megan R. Webb, Assistant Attorney General, Anchorage, and John J. Burns, Attorney General, Juneau, for Appellee. Dianne Olsen, Law Office of Dianne Olsen, Anchorage, for Guardian ad Litem.

Before: CARPENETI, Chief Justice, FABE, WINFREE, and STOWERS, Justices.

## OPINION

PER CURIAM.

## I. INTRODUCTION

This appeal arises from a Child In Need of Aid (CINA) case involving four Indian children who were removed from their parents' care due to substance abuse and domestic violence. The children were placed with their maternal grandmother, who claims that the Office of Children's Services (OCS) permanently removed the children and placed them with a non-Native foster family while she was away in Montana caring for her elderly mother. OCS responds that the grandmother requested that the children be removed from her care. There were also substantiated reports of harm relating to the grandmother's care, and the tribe expressed dissatisfaction with the children's placement with their grandmother. After the grandmother returned from Montana to Alaska, the children stayed with the foster family while the grandmother provided afternoon care. But OCS terminated the grandmother's visitation when the tribe and the foster family complained that the children were behaving poorly after the visits. After removing the children from the grandmother's care, OCS did not provide the grandmother with notice of scheduled permanency or placement hearings for the children.

Over a year after returning from Montana, the grandmother formally requested that the children be placed with her. OCS denied this request and the grandmother appealed, arguing that the children should be placed with her and that the failure to provide her with notice of hearings conducted during the preceding year violated her due process rights. After the standing master conducted a full hearing on the grandmother's placement request, the superior court denied the request, finding good cause to deviate from the Indian Child Welfare Act's (ICWA) placement preferences. The court further concluded that the grandmother was neither entitled to notice of earlier hearings nor prejudiced by a lack of notice. After the superior court proceedings, the children were adopted by the foster family with whom they had bonded. The grandmother appeals, arguing that because she did not receive proper notice of the earlier proceedings related to the children and because there was not good cause to deviate from the ICWA preferences, the adoption should be set aside and OCS

should begin to reunify her with her grandchildren. The grandmother is correct in her argument that she did not receive proper notice of the earlier permanency proceedings. But because any prejudice to the grandmother was cured by the subsequent hearing in which she participated and was able to present evidence and cross-examine witnesses, and because the superior court did not commit plain error by finding good cause to deviate from ICWA's placement preferences, we affirm the superior court's ruling.

## II. FACTS AND PROCEEDINGS

### A. Initial Removal

This case involves four children: Eddie (born March 1996), Tawny (born August 1997), Callie (born January 2001), and David (born February 2005).[1] The children's mother, Maddie, is an enrolled member of the Northern Cheyenne tribe. The three younger children's father, Steve, is an enrolled member of the Gulkana Village tribe (Gulkana).[2] The children were initially taken into OCS custody in May 2006 due to their exposure to Maddie and Steve's domestic violence and substance abuse.

After OCS obtained custody of the children, the younger three were placed with their paternal grandmother and Eddie with his maternal great-grandfather. The placements changed slightly over the year: In September 2006 Callie was placed with Paula, her maternal grandmother, and in January 2007 David was placed with his mother, who was undergoing substance abuse treatment. Paula obtained a foster care license and by June or July 2007 all four children were in her care.[3] Gulkana's former ICWA

worker testified that, at that time, she thought Paula was very culturally oriented. She stated that while she had concerns regarding how crowded Paula's house could be, those concerns had been addressed.

By January 2008 the children's mother had made improvements and completed her first phase of treatment, and so the children were returned to her for a trial home visit. This was unsuccessful, and in July 2008 the children were removed and again placed with Paula. Following a hearing, the permanency plan was then changed from reunification to adoption. OCS identified Paula as a potential adoptive parent. In December 2008 the children's father relinquished his parental rights, and in July 2009 the children's mother relinquished her rights.

### B. Children's Placement With Paula From July 2008 Until Summer 2009

■ In December 2008 a home study for adoption by Paula was completed and the results of this study were apparently mostly positive.[4] Lori Wikle, the OCS caseworker, testified that the most pressing concern was whether Paula was committed to the long-term adoption of the children.

While the children were placed with Paula, Wikle conducted monthly home visits. She testified that in each progressive visit Paula looked more exhausted and appeared to be pulled in many directions with commitments to various family members. Wikle and Valerie Nelson, Gulkana's ICWA worker, testified to a conversation around March 2009 between Paula, themselves, and a few others where a different, more suitable placement was discussed.[5] Both testified that Paula

1. We use pseudonyms to protect the privacy of those involved.

2. All the children are enrolled in the Northern Cheyenne tribe and all are enrolled or are eligible for enrollment in the Gulkana Village tribe.

3. There is some dispute as to when all four children were in Paula's care. While it is unclear exactly when all the children moved from their initial placements to Paula, OCS's permanency report to the superior court indicates that by at least July 2007 all the children were with Paula.

4. The home study, although referenced at the hearing, was never admitted into evidence. Pau-

la references facts from the home study throughout her brief. As discussed more fully below, we consider only those facts that were also developed during the testimony or in other properly admitted documents.

5. Paula admits that there was a meeting in this time frame but denies that this conversation was a formal discussion in which she requested a different placement. The children's placement with Paula appeared to be acceptable to all involved until around March 2009. In February 2009, the superior court noted that the children "are doing well" in their current placement.

agreed she "wanted to just be grandma" again.

At about the same time, OCS began receiving both informal and formal reports regarding the children's well-being. OCS received three reports of harm from Gulkana. Two reports were formal letters from the tribal council and one was an informal report from a concerned tribal member. The reports expressed concerns about Paula's extensive travel to Anchorage, the cleanliness of her house, her lack of control and supervision of the children, and her practice of driving with the youngest child in the car without a car seat.

The children were supposed to be attending therapy sessions, but Paula was often unable to get the children to the appointments. Despite OCS's involvement in setting up appointments and transportation, Tawny attended only two sessions and Eddie and Callie only one. Tawny told her therapist that Paula had hit her hard enough to knock her down and to leave bruises. Based on this information, the therapist filed a report of harm.

The children's school also sent notices to OCS regarding the behavior and condition of the children. The school was specifically concerned with Eddie's poor grades and bullying behavior and Tawny's lack of proper medication for her skin condition. Additionally, the school was concerned that the children did not have food in their lunches.[6] Wikle investigated these complaints. The children reported that Paula used corporal punishment. Wikle told Paula that foster parents were not allowed to use corporal punishment, but the punishments continued.

Sometime in May 2009 Paula became aware that her mother, who lived in Mon-

tana, was ill and required her assistance. Paula told OCS that she needed to go to Montana three days before she left.[7] Based on the emergency need the children were placed with the Dubovs, the non-Native foster family with whom they had stayed for various other short visits. Paula supported the placement at that time, but later asserted that she thought the placement was temporary, noting that she "was just going to go out and take care of some business and come back, and the children would be back with [her]." OCS asserted that Paula "did not want the children back when she left, and [OCS was] working under that premise."[8] Accordingly, OCS proceeded to seek ICWA-compliant long-term placement for the children, treating the Dubovs as a temporary placement.[9]

### C. Paula's Return To Alaska

Upon her return to Alaska in August 2009, Paula learned that OCS was not planning to return the children to her. In September 2009 the State did not renew Paula's foster care license because two of the reports of harm made against her had been substantiated. Wikle testified that even though Paula was no longer considered a proper placement, she was willing to try to work with Paula to address the concerns that led to the children not being placed with her. It is unclear from the record whether the denial of the foster care license or other concerns precipitated OCS's refusal to return the children to Paula. But it is clear that the children were never returned to Paula's care, and Paula never reapplied for the foster care license.

There is some dispute between the parties as to when Paula actually requested place-

---

6. Paula testified that she did not pack the children's lunches because they participated in a subsidized lunch program.

7. Paula suggests that she gave OCS more notice; she relies on an unadmitted email between the ICWA worker and Wikle that indicated she requested passports for the children, but Paula's own testimony supports OCS's assertion that Paula provided three days' notice before leaving the state for a prolonged period of time.

8. But there is an unadmitted email sent by OCS that suggests that care would be found for the

children "while [Paula] is out of state." Another email from the Dubovs stated that both the children and their mother were under the impression that the children would return to Paula's care upon her return. Paula relies on some of these facts in her brief, but the facts were not established through admitted evidence or testimony.

9. OCS conducted several meetings with Gulkana members, sent a worker to another village, and requested information from the Cheyenne tribe searching for alternative relative or ICWA-compliant placements.

ment. Paula testified that while she did not make a formal request, it was well known to OCS that she wanted the children returned to her care.[10] She also explained that she did not ask that the children be placed with her or attempt to renew her foster license because she was trying to work with OCS toward the eventual return of the children:

Q. Did you reapply for your foster care license . . . ?

A. . . . I figured I had to work with OCS and find out what was going on and what the process was to even get the children back.

. . . .

Q. . . . [You] didn't ask for placement of the children at that time because you were trying to work with everybody and be co-operative?

A. Well, yeah. Wouldn't that be the first step in trying to regain something?

Paula formally made a request for placement in September 2010, and it was denied. OCS asserted that this was Paula's first request for placement, although OCS had been working with Paula, calling to set up scheduled visits and leaving cards at her door.

Paula was still involved with the children after she returned from Montana. For several weeks, she provided daycare and after-school care for the children. But OCS suspended these visits due to concerns about the children's behavior when they returned to the Dubovs. According to OCS, Paula needed to work on OCS's concerns and engage in supervised visits in order to continue her relationship with the children. Visitation supervisors were sought at two Gulkana tribal council meetings, and although there were two volunteers to supervise the visits, the visits never occurred. Wikle testified that she called and stopped by Paula's house numerous times to connect with Paula in hopes of encouraging a relationship with the children, but Paula denies that these contacts occurred. At no point did OCS develop a formal plan to help Paula obtain custody of the children.

In February 2010 OCS filed for temporary and long-term protective orders preventing Paula from going near the children. OCS also implemented a no-contact order for Pau-

la and Maddie after Paula made allegations, which turned out to be unsubstantiated, that Mr. Dubov was acting inappropriately toward Callie and Tawny and that the children were generally neglected. OCS was concerned that Paula had "coerc[ed]" Callie into writing a letter alleging inappropriate behavior by Mr. Dubov.

Paula's tribe, the Northern Cheyenne, attempted to intervene in the case; it was given participant status but denied party status. Until she left for Montana in June 2009, Paula was able to attend all hearings related to the children. But after her return, she did not receive notice of the permanency and placement hearings until she formally requested and was denied placement in September 2010.

### D. Attempts To Find ICWA–Compliant Placement

OCS did not initially intend the Dubovs to be a permanent placement option. OCS conducted several meetings with Gulkana members, sent a worker to another village, and requested information from the Northern Cheyenne tribe searching for relatives or other ICWA-compliant placements. In early 2010 OCS learned that relatives in Montana were interested in taking the children, but although a placement request was initiated, OCS found that it was not in the children's best interests to move to Montana.

### E. The Children's Placement With The Dubovs

Before the children were first placed with the Dubovs, they exhibited significant behavioral problems. Throughout their time with the Dubovs, though, the children improved dramatically. Their school performance improved, they become more sociable, and they were doing "incredibly well." Although the Dubovs are not Native, they took care to ensure that the children participated in cultural activities, such as a dance group, potlatches, and other Gulkana social events. They also facilitated regular contact between the children and their extended family, including their paternal great-grandfather.

---

**10.** It is clear from the record that OCS knew Paula wanted the children back.

The children and the Dubovs developed a deep family bond. A psychiatric nurse testified that changing placement would be highly traumatic and harmful to the children. In January 2011 the Dubovs adopted all four children.

### F. Various Hearings Regarding The Children's CINA Cases

After the children were removed from Paula's care, several hearings occurred for which Paula did not receive notice. The first, in July 2009, was the termination of parental rights proceeding at which the children's mother voluntarily relinquished her parental rights.[11] In August 2009 a permanency hearing was held at which Gulkana's ICWA worker informed the master that the "grandmother [was] okay with the plan now." The superior court adopted the master's finding that placement with the Dubovs was reasonable and in the children's best interests and that all parties entitled to notice had been served with notice of the proceeding. But Paula was not served with notice of this hearing.

In December 2009 a status hearing was held, but Paula did not receive notice of this hearing. In July 2010 a permanency hearing was held. There, the superior court determined that a hearing was necessary to consider placement with relatives in Montana, who had been denied placement by OCS. Paula was not given notice of this proceeding.

The placement hearing was held in September 2010 to review OCS's placement decision regarding relatives in Montana. Paula was not given notice and did not attend this hearing. At this hearing, there was a significant amount of testimony presented regarding the placement history with Paula and the challenges she faced in trying to raise the children. The master found that there was good cause to deviate from ICWA preferences and that placement with the Dubovs was proper because the children were bonded with and had expressed a preference to stay with the Dubovs.

### G. Paula's Request For Placement

In September 2010 Paula formally requested placement of the children with her, but OCS denied that request. Paula sought court review of OCS's denial of her placement request. Hearings on Paula's request were held in November and December 2010 before Magistrate Wilkinson, acting as the standing master. At the hearings, Paula argued that OCS failed to provide proper notice of prior hearings and that she was entitled to placement.

The evidence at the hearing incorporated the testimony from the September 2010 hearing, in which Paula had not participated. Despite this, the master found that Paula was not prejudiced by OCS's failure to provide notice of the permanency hearings and determined alternatively that any harm had been cured by the new placement review hearing at which Paula was present and permitted to participate. The standing master reasoned that Paula was not entitled to notice of the hearings in 2009 and 2010 under AS 47.10.088(i) because she was not eligible for a foster care license. The master also determined that Paula was not entitled to notice of OCS's removal of the children because Paula had initiated the removal herself when she left for Montana. Finally, the master found that there was good cause to deviate from ICWA-compliant placement and that it was in the children's best interests to remain with the Dubovs.

Paula filed objections to the master's findings. The superior court adopted the master's findings, noting that Paula had not objected to the master's factual finding that there was clear and convincing evidence of good cause to deviate from the ICWA placement preferences.

Paula now appeals, arguing that the superior court erred when it found that OCS's failure to provide notice regarding the CINA proceedings did not prejudice her and that the superior court abused its discretion when it found good cause to deviate from an ICWA-compliant placement. She argues that the adoption should be set aside and the

---

11. She later tried to revoke the relinquishment, apparently after learning that Paula was not go-

ing to be the adoptive parent, but was too late.

children placed with her so that she can adopt them.

## III. STANDARD OF REVIEW

Whether there was a violation of due process is a question of law that we review de novo, adopting "the rule of law that is most persuasive in light of precedent, reason, and policy."[12] In a CINA case we review the superior court's factual findings for clear error.[13] We will reverse only if we are left with "a definite and firm conviction that a mistake has been made."[14] When reviewing mixed questions of law and fact, we review factual questions under the clearly erroneous standard and legal questions using our independent judgment.[15] We review the superior court's finding of good cause to deviate from ICWA placement preferences using an abuse of discretion standard.[16]

## IV. DISCUSSION

### A. Evidentiary Issues

There are two evidentiary issues in this case. First, OCS and the guardian ad litem (GAL) contend that Paula's brief relies upon evidence that was not admitted in the superior court and therefore cannot be relied upon by this court. Paula argues that it is "unclear exactly what the trial court relied on in making its decision" and that therefore the entire trial file should be reviewable. Paula also argues that unadmitted documents gen-

erated by OCS do not present concerns about reliability.

OCS and the GAL are correct that Paula has improperly relied upon exhibits that were not admitted in the superior court. Paula relies heavily on exhibits that were not admitted into evidence, particularly the home study and various OCS notes. We have noted that although under Appellate Rule 210(a)(1), unadmitted exhibits "become 'documents' in the court file" and are therefore not stricken from the record, because parties have "no opportunity to respond to [them] or challenge [them]," unadmitted exhibits are to be afforded no weight.[17] Paula has not asserted a claim that the master erroneously excluded these documents from evidence. Accordingly, we give no weight to these unadmitted assertions. Paula also claims that "it is unclear exactly what the trial court relied on in making its decision, so anything the trial court *may* have considered should be reviewable." (Emphasis added.) A closer look, however, reveals that Paula is actually making claims about the master's interpretation of evidence and is incorrect in her allegation that the master relied on evidence that was not presented during the hearing.[18] Thus, we will consider only the evidence that was admitted at the hearing.

Paula next argues that the master's reliance on evidence from the September 2010 hearing violated her right to due pro-

**12.** *D.M. v. State, Div. of Family & Youth Servs.,* 995 P.2d 205, 207 (Alaska 2000) (internal quotation marks omitted) (quoting *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

**13.** *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 175 P.3d 1263, 1267 (Alaska 2008) (citing *Brynna B. v. State, Dep't of Health & Soc. Servs.,* 88 P.3d 527, 529 (Alaska 2004)).

**14.** *Id.* (internal quotation marks omitted) (quoting *A.B. v. State, Dep't of Health & Soc. Servs.,* 7 P.3d 946, 950 (Alaska 2000)).

**15.** *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 204 P.3d 1013, 1018 (Alaska 2009) (citing *A.M. v. State,* 945 P.2d 296, 304 n. 10 (Alaska 1997)).

**16.** *C.L. v. P.C.S.,* 17 P.3d 769, 772 (Alaska 2001) (citing *Adoption of N.P.S.,* 868 P.2d 934, 936 (Alaska 1994)).

**17.** *Moffitt v. Moffitt,* 749 P.2d 343, 348 n. 4 (Alaska 1988).

**18.** For example, Paula argues the master found that she knew the children would not be returned to her once she got back from Montana even though there was evidence to the contrary, and she also argues the master found that the Dubovs were not considering adoption in the fall of 2009 despite "evidence" that they were doing so. However, in both those cases the master relied upon evidence that was presented. There was testimony that Paula herself initiated the removal of the children from her care, and the evidence admitted in court suggested that the Dubovs supported Native placement. Although there was evidence that the Dubovs were seeking adoption or at least that it was an option in August 2009, it was not admitted at the hearing.

cess because she was not present at that hearing and thus did not have the opportunity to cross-examine witnesses. Because this argument was only raised in Paula's reply brief, OCS did not address it. The GAL, however, did address this issue in her brief, pointing out that while Paula was not given notice of the hearing and did not attend, she was given notice that the testimony would be used at the later hearing and could have called and examined or cross-examined any witness from the earlier hearing. The GAL also points out that Paula did not object to the use of the September 2010 evidence at the later hearing.

The GAL is correct in her assertion that Paula was given notice of OCS's intent to rely on the September 2010 hearing. The proper time for Paula to have raised this argument was in the superior court. The CINA rules provide for the introduction of the previous testimony,[19] and because Paula did not object to the master's consideration of the evidence from the September 2010 hearing, the master cannot be faulted for her consideration of that evidence.

## B. The Failure To Provide Statutorily Mandated Notices In The CINA Proceedings Did Not Violate Due Process.

Paula raises several claims that she was denied due process. She argues that she should have been provided with notice of her right to challenge placement in 2009, her right to challenge denial of visitation with the children, and her right to attend permanency hearings in 2009. We address each separately as different rules apply to each. In each case, we ask two questions: first, whether Paula was entitled to notice, and second, whether failure to provide notice was a violation of her due process rights.

### 1. The transfer of placement

■ Paula argues that as a foster parent she was entitled to notice of the children's transfer of placement from her care in July 2009. She argues that the children's placement with the Dubovs while she was in Montana was a temporary placement and that she was entitled to notice once OCS decided to make it permanent.[20] Additionally, she construes this placement decision as "essentially a denial of placement," and therefore argues that she was entitled to know the basis for the removal and to request a hearing. OCS and the GAL concede that there was no notice, but argue that Paula was not entitled to notice because she initiated the transfer.

Alaska Statute 47.10.080(s) provides that foster parents are entitled to notice of non-emergency transfers of children for whom they are caring, and AS 47.14.100(m) provides that grandparents are entitled to notice of the right to appeal an OCS decision not to place a child with them. Paula was the foster parent and a grandmother and thus would have been entitled to notice of a transfer under AS 47.10.080(s) and AS 47.14.100(m). But in this case, she did have notice because she requested the transfer herself. Although Paula disputes that she requested the transfer, the master found that Paula initiated the removal of the children, and Paula does not argue that the finding is clearly erroneous. Because Paula initiated the transfer, she had notice of the transfer.

■ Paula also argues that she was entitled to notice when the State denied her request that the children be returned to her upon her return from Montana. The record is somewhat vague, however, as to whether Paula actually requested placement of the children with her before the fall of 2010.

**19.** CINA Rule 17(e) provides:

Hearsay which is not otherwise admissible under a recognized exception to the hearsay rule may be admissible at the disposition hearing and in review of a disposition order if the hearsay is probative of a material fact, has circumstantial guarantees of trustworthiness, and the appearing parties are given a fair opportunity to meet it.

**20.** Paula also argues that OCS's position on whether this was a non-emergency transfer has changed over the course of litigation. OCS did put forth an alternative argument that AS 47.10.080(s) did not entitle Paula to notice of transfer because it was an emergency transfer, but even there OCS noted that Paula had requested that the children be moved. In any event, whether it was a non-emergency or emergency transfer does not matter in the analysis as Paula requested the transfer.

The record does demonstrate that Wikle was trying to work with Paula to take the steps necessary to remain in the children's lives; according to the master's findings, Paula did not cooperate with Wikle, did not reapply for a foster care license, and interfered with the children's placement with the Dubovs. Again, Paula does not challenge these findings.

### 2. Denial of unsupervised visitation

■ Paula argues that under AS 47.10.080(p), OCS was required to provide her with the reasons for denying her visitation with the children and inform her of her right to request a hearing on that decision. OCS and the GAL respond that Paula was not denied visitation but rather was denied unsupervised visits. OCS maintains that it took immediate steps to enable continued visitation, but Paula failed to follow through with supervised visits, despite the availability of volunteer supervisors from Gulkana. OCS asserts that it was Paula's "complete lack of engagement" and her "own conduct [that] caused the termination of visitation, so the notice requirement was not triggered."

Alaska Statute 47.10.080(p) requires OCS to provide reasonable visitation to family members, and, where visitation is denied, the "department shall inform the . . . family member of a reason for the denial and of the . . . family member's right to request a review hearing." The master did not make specific findings regarding the visitation, presumably because the hearing was to address OCS's placement denial. However, the master understood that Paula was permitted to have supervised visits and noted that Paula had failed to pursue visitation supervised by the Gulkana volunteers. Paula does not dispute that supervised visits were offered and even admits to the difficulties in trying to schedule the visits. Because Paula was not denied reasonable visitation, there was no requirement to provide notice under AS 47.10.080(p).

### 3. Permanency and placement hearings

Paula next argues that as a grandparent she was entitled to notice of the permanency hearings that occurred in August 2009 and July 2010. OCS and the GAL do not dispute that OCS failed to provide notice, but they argue that the lack of notice did not prejudice Paula because, as the master found, any problems were cured by the subsequent hearing where Paula was present and able to participate fully.

■ The master found that AS 47.10.088(i) relieved OCS of its duty to provide notice to Paula because she was not eligible for a foster care license. But Paula was entitled to notice of the permanency hearings. Alaska Statutes 47.10.030(d)[21] and 47.10.080(f)[22] provide that grandparents should receive advance written notice of all proceedings concerning the children, including permanency hearings. Paula is a grandparent and accordingly is entitled to notice under these statutes.

Because Paula was entitled to notice of the permanency hearings, we turn to the question whether the failure to provide notice was a violation of Paula's due process rights. Paula argues that the failure to provide her with appropriate notice prejudiced her and impacted the outcome of the placement decisions. She argues that the master and the superior court improperly determined that the lack of notice was harmless error. She argues that harm was demonstrated because the master relied heavily on the children's bonding with the Dubovs in affirming OCS's placement decision and because she was unable to present her position to the court. OCS and the GAL respond that Paula was not prejudiced by the lack of notice, or alternatively, that any prejudice was cured by the

---

21. AS 47.10.030(d) provides:

 Except as provided in (e) of this section, the department shall give advance written notice of all court hearings in a child's case to a grandparent of the child if
 . . . .
 (2) the department is aware that the child has a grandparent and the grandparent's mailing address is on file with the department.

22. AS 47.10.080(f) provides, in relevant part:

 The persons entitled to notice under AS 47.10.030(b) and the grandparents entitled to notice under AS 47.10.030(d) are entitled to notice of a permanency hearing under this subsection and are also entitled to be heard at the hearing.

hearing that was finally held to review placement.

■ When determining the requirements of due process, we employ a three-factor test: [23]

[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and, finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[24]

■ We have held that "[t]he crux of due process is opportunity to be heard and the right to adequately represent one's interests." [25] Generally, notice ensures these rights.[26] The government interest in not providing notice is rarely significant because "notice requirements impose little fiscal or administrative burden upon government agencies." [27] Even if notice is inadequate, "the opportunity to be heard can still be preserved and protected if a party actually appears" and presents his or her claim.[28]

■ Although we have never directly addressed the question of a grandparent's due process rights in CINA proceedings, we have previously noted that failure to provide notice might result in the violation of due process.[29] We have also stated that the "placement of children and the involvement of grandparents in their grandchildren's lives are not matters to be taken lightly." [30] The legislature's requirement that OCS must provide grandparents with notice in CINA proceedings similarly strongly supports the idea that grandparents have a protectable interest in such proceedings.

■ Because notice is required by statute, and because grandparents have a strong interest in the outcome of CINA proceedings, the first and third prongs of the *Mathews* test weigh in favor of finding a due process violation. However, the second prong of the *Mathews* test requires us to ask whether additional process would have benefited Paula. In other words, we must ask whether Paula was likely to have achieved a more favorable outcome if she had been given notice of the 2009 permanency hearings. Although the due process analysis is a flexible and contextual one focusing on the interest and not the outcome,[31] there must be some actual prejudice under the second prong and not merely the "theoretical possibility of prejudice." [32]

■ This appeal presents a close case. OCS plainly failed in its obligation to provide Paula with the notice to which she was entitled. As far as we can tell from the record, OCS has provided no excuse for its failure. Nonetheless, we still must determine the extent to which Paula's absence from the two permanency hearings may have prejudiced her case. A permanency hearing was held on August 26, 2009, shortly after Paula had returned to Alaska. Under CINA Rule

**23.** *D.M. v. State, Div. of Family & Youth Servs.,* 995 P.2d 205, 212 (Alaska 2000) (citing *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).

**24.** *Id.* (citing *Mathews,* 424 U.S. at 334–35, 96 S.Ct. 893).

**25.** *Id.* at 213–14 (internal quotation marks omitted) (quoting *Matanuska Maid, Inc. v. State,* 620 P.2d 182, 192 (Alaska 1980)).

**26.** *Id.* at 214 (citing *Matanuska Maid,* 620 P.2d at 193).

**27.** *Id.* at 212.

**28.** *Id.* at 214 (internal quotation marks omitted) (quoting *Matanuska Maid,* 620 P.2d at 193).

**29.** *Jacob v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 177 P.3d 1181, 1185 (Alaska 2008) (*Jacob I* ) (declining to comment fully on whether failure to provide notice is a violation of due process).

**30.** *State, Dep't of Health & Soc. Servs., Office of Children's Servs. v. Jacob,* 214 P.3d 353, 362 (Alaska 2009) (*Jacob II* ).

**31.** *D.M.,* 995 P.2d at 218 (Bryner, J., dissenting) (citing *Mathews,* 424 U.S. at 334–35, 96 S.Ct. 893).

**32.** *Id.* at 212.

17.2(a), "[t]he purpose of the permanency hearing is to establish a permanency plan for each child." Before the August 2009 permanency hearing, the permanency plan was adoption, and the permanency plan was not changed at the hearing. At the permanency hearing, the court was evidently told that the "grandmother is okay with the plan now." The court found that placement with the Dubovs was reasonable in light of the permanency plan of adoption. At about this time, OCS substantiated two reports of harm made against Paula, and she was consequently denied a renewal of her foster care license. It is therefore unlikely that Paula's presence would have changed the result of the hearing.

At the second hearing the superior court determined that continued placement with the Dubovs was appropriate, and a placement hearing was set to review OCS's denial of placement with relatives in Montana. Nothing in the record suggests that Paula was prejudiced by her absence from this hearing.

The September 2010 placement hearing is more complicated. Under AS 47.10.030(d), Paula was entitled to notice of this hearing. But OCS again failed to provide the required notice and, in Paula's absence, there was a significant amount of testimony relating to Paula's parenting and the children's initial placement with the Dubovs. OCS relied upon this testimony at Paula's placement hearing. However, at her later placement hearing Paula was able to call witnesses and present her own evidence to contradict the testimony at the earlier hearing. For example, testimony at the September 2010 hearing regarding the conversation about Paula wishing to return to her status as "just [a] grandma" was further developed at Paula's placement hearing. Although OCS's dereliction prevented her from responding to the evidence against her at the September 2010 hearing itself, she was able to fully address the evidence ten weeks later in her own proceedings. It does not appear that Paula was prejudiced by this delay in presenting her evidence.

Paula argues that the entire one-year period during which she did not receive notice of hearings prejudiced her case because the judge found that the children became deeply bonded with the Dubovs in that time. But this overstates the master's reliance on the bonding between the Dubovs and the children. Although the master did note the family bond and the children's marked improvement in behavior as factors in the decision to deny placement with Paula, they were only a few of the many elements the master considered. The master found that Paula was not a good placement in this case because she lacked parenting skills and OCS had received substantiated reports of harm to the children while in Paula's care. Moreover, the master found that Paula did not cooperate or work with OCS to facilitate a relationship with her grandchildren. Further, the master found that it was Paula's "feud with Gulkana village and her allegations of harm against" Mr. Dubov that prevented her bonding with the children, not the length of time the children were with the Dubovs.

The crux of the due process claim here is that Paula was not afforded the opportunity to be heard until the hearings in November and December 2010. But although OCS failed in its duty to provide Paula with legally required notices, Paula later had a full opportunity to be heard. Had Paula not been provided with the opportunity to be heard, her due process rights would have been violated. But the subsequent hearings allowed her to "adequately represent [her] interests," curing any due process violation stemming from OCS's failure to provide earlier notice.[33] After hearing from Paula and her witnesses and considering all of Paula's evidence, the master found that Paula was not a proper placement.

The dissent argues that had Paula participated, and especially had she been present at the September 2010 placement hearing, she would have been better able to present her arguments and respond to the evidence against her. But Paula ultimately did get that chance—she had a full hearing, after which the master made findings, which even

---

33. *D.M.*, 995 P.2d at 213–14 (internal quotation marks omitted) (quoting *Matanuska Maid, Inc. v.* *State*, 620 P.2d 182, 192 (Alaska 1980)).

now Paula does not challenge. Nonetheless, the dissent would allow Paula to reopen the children's adoption to give her another hearing on the precise issue that was already litigated at her placement hearing. The dissent would do this despite recognizing the "considerable pain" and "potential anguish" it could cause the children.[34] Here the children have lived with the Dubovs for almost three years, have been adopted by the Dubovs, refer to the Dubovs as their "mom" and "dad," and are reportedly doing "incredibly well" with the Dubovs. Yet the dissent would give Paula essentially the same hearing she already had, despite the fact that Paula does not now challenge the critical factual findings on which the superior court based its decision that she was not a suitable placement.[35]

The dissent further seems to suggest that it is relevant to our analysis that "[w]e have been troubled many times in recent years by the State's failure to meet its statutory requirements concerning handling of children's cases."[36] The dissent remarks that although we have "upheld the State's action[s]" in those cases as "good enough," it cannot "join in this approach in the case before us."[37] But we address each case on its own merits, and our job is to determine whether the superior court has erred in its factual findings or legal conclusions. Any frustration with OCS should not lead us to adopt a "last-straw" doctrine of jurisprudence. Whether

or not OCS may have tested the boundaries of acceptable effort in a past case has no bearing on whether Paula's rights were violated *in this case*. Further, although OCS failed to provide the required notice in this case—and we certainly do not condone that failure—our job is to analyze whether this error was prejudicial in light of the later hearing where Paula had an opportunity to appear and be heard. Here the case turns on the question of prejudice. Given that Paula has not challenged any of the master's factual findings after the November and December 2010 hearings where she had a full opportunity to put on evidence and call or recall witnesses and cross-examine them, we conclude that the prejudice from OCS's failure to provide the required notice was cured.[38]

We conclude that Paula was entitled to notice of the permanency hearings and placement hearings after May 2009. But based on the superior court's unchallenged findings, we conclude that any prejudice was cured by Paula's ability to participate fully at the placement review hearings in November and December 2010. Paula's due process rights were therefore not violated.

## C. The Superior Court Did Not Err In Finding Good Cause To Deviate From ICWA Placement Preferences.

Paula next argues that the superior court erred in finding good cause to deviate from

---

34. Dissent at 443 n. 16.

35. The dissent goes a step further, suggesting that at such a remand hearing, the trial court would be required to blind itself to any evidence of how well the children are doing in their current placement. Dissent at 443 n. 16. Yet, we have repeatedly stressed that even when analyzing whether there is good cause to depart from the ICWA placement preferences, "the best interests of the child remain paramount." *Adoption of N.P.S.*, 868 P.2d 934, 936 (Alaska 1994) (citing *In re Adoption of F.H.*, 851 P.2d 1361, 1363–64 (Alaska 1993)); *see also L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 955 (Alaska 2000) (noting that "[c]ourts in other jurisdictions have held that 'the certainty of emotional or psychological damage to the child if removed from the primary caretaker may also be considered by the court in determining whether good cause exists to deviate from the placement preferences of ... ICWA.'") (quoting *People ex rel. A.N.W.*, 976 P.2d 365, 369 (Colo.App.1999)). The exclusionary rule proposed by the dissent, in

which the finder of fact would be precluded from hearing any evidence as to the children's bonding with the Dubovs and the likely emotional harm that would come from undermining the adoption, would effectively invert the usual analysis by giving Paula's interest in having the children placed with her precedence over the children's best interests.

36. Dissent at 442.

37. Dissent at 442–43.

38. The dissent is also understandably concerned about the fact that several of Paula's exhibits were not introduced into evidence at the hearing, as well as the foster father's role as a tribal representative. Dissent at 442–43 n. 14, n. 15. But Paula does not challenge the exclusion of evidence, nor does she challenge the foster father's tribal association. Therefore, there is no basis for considering these facts as part of Paula's due process challenge.

ICWA's placement preferences. ICWA establishes placement preferences for Indian children in foster homes and preadoptive settings.[39] The Dubovs do not meet any of the criteria set out in ICWA's placement preferences. Paula would normally be entitled to preferential placement unless the superior court found good cause to deviate from the placement preferences. Here the superior court adopted the master's findings that there was good cause to deviate from ICWA's placement preferences.

### 1. Paula failed to preserve this argument by failing to object to the master's findings below.

■ Although Paula now argues that the superior court erred on this point, the superior court noted that Paula failed to object to the master's findings that there was good cause to deviate from ICWA placement preferences. OCS argues that Paula has consequently waived the argument. Paula makes no response.

OCS is correct. We have held that "Alaska Civil Rule 53(d)(2) requires any party who disagrees with a master's finding to file a timely objection to the finding at the trial court level as a prerequisite to challenging the finding on appeal."[40] If there is a failure to object then this court may only review for plain error.[41]

■ Before the superior court, Paula raised two objections to the master's findings. She objected to the "[m]aster's finding that Alaska Statute 47.10.088(i) relieves the State of its duty to provide notice" and the master's finding that the "State's failure to provide the requisite notices to her did not prejudice her." She made no mention of the master's findings of good cause to deviate from ICWA's placement preferences. Because Paula failed to object below, we review the superior court's findings only for plain

error. Plain error exists "where an obvious mistake has been made which creates a high likelihood that injustice has resulted."[42] Under this standard, we conclude that it was not plain error for the superior court to find good cause to deviate from ICWA's placement preferences.

### 2. The superior court's decision to deviate from ICWA's placement preferences was not plain error.

■ Paula argues that there was not good cause to remove the children from her care.[43] She argues that there was never any inquiry into whether the children's placement complied with ICWA in 2009. OCS and the GAL do not directly respond to this argument, instead focusing on whether there was good cause to deviate from ICWA placement preferences more generally.

Paula's argument is contingent upon her claim that she did not agree to having the children removed, a claim rejected by the master in a factual finding that was not challenged by Paula.[44] As Paula recognizes, 25 U.S.C. § 1916 provides that "[w]henever an Indian child is removed from a foster care home or institution for the purpose of further foster care, preadoptive, or adoptive placement, such placement shall be in accordance with the provisions of this chapter...." This statute means that OCS cannot evade ICWA's placement preferences by a second removal. Paula argues that the children's placement with the Dubovs upon removal from her care was not ICWA compliant and that there was no inquiry into whether the placement complied with ICWA. But before the master determined at the September 2010 hearing and Paula's placement hearings that there was good cause to deviate from ICWA-compliant placements, the master considered the factual circumstances of the initial removal from Paula's care. The master

39. 25 U.S.C. § 1915(b) (2006).

40. *Duffus v. Duffus*, 72 P.3d 313, 318 (Alaska 2003).

41. *Id.* at 319.

42. *Id.* at 319 (internal quotation marks omitted) (quoting *D.J. v. P.C.*, 36 P.3d 663, 668 (Alaska 2001)).

43. Based on the argument heading in her brief Paula appears to argue that OCS needed to show good cause to remove the children; however, this argument is not clearly developed in the body of her brief. Instead she focuses on OCS's alleged trickery in removing the children after she left for Montana.

44. A significant portion of her argument also relies on facts that were not admitted at trial.

heard evidence about OCS's attempts to locate ICWA-compliant placement, as well as Paula's failure to work cooperatively with OCS on supervised visitation or the steps necessary to become an acceptable placement.

Paula also argues that the children's placement with the Dubovs violated ICWA. She asserts that the master improperly placed the burden on her to show that she was a suitable placement and that OCS failed to show good cause to deviate from placement preferences. OCS and the GAL argue that there was good cause to deviate from the placement preferences.

 Paula's arguments are unconvincing. While she is correct that OCS bears the burden of showing good cause to deviate from placement preferences,[45] it was not plain error for the superior court to find that OCS had met that burden. Indeed, there is ample evidence in the record supporting the superior court's good cause finding.

Although ICWA does not define "good cause," we have held that "[w]hether there is good cause to deviate from ICWA's placement preferences in a particular case depends on many factors."[46] We have previously looked to the Bureau of Indian Affairs guidelines for examples of factors that would support good cause to deviate,[47] including:

(i) The request of the biological parents or the child when the child is of sufficient age.
(ii) The extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness.
(iii) The unavailability of suitable families for placement after a diligent search has been completed for families meeting the preference criteria.[48]

We have noted that "the certainty of emotional or psychological damage to the child if removed from the primary caretaker may also be considered by the court in determining whether good cause exists to deviate from the placement preferences of ... ICWA."[49] Most significantly, we have held that "[a]lthough ICWA and the guidelines draw attention to important considerations, the best interests of the child remain paramount."[50]

Applying these principles here, we conclude that the master did not clearly err in finding good cause to deviate from ICWA's placement preferences. First, OCS made significant efforts to locate possible ICWA-compliant placement after the children were no longer in Paula's care. Wikle requested relative searches through the Gulkana tribe, requested that the licensing unit locate an ICWA-compliant home, sent an OCS worker to another village to speak with possible relative placements, and once the Northern Cheyenne was identified as a possible tribal affiliation, sent letters to that tribe seeking relative placement. A possible relative placement was found in Montana, but OCS rejected that placement because it was not in the best interests of the children.

The superior court also adopted the master's findings that the children "have suffered trauma at the hands of" their caregivers, including Paula. And there was evidence, including expert testimony, that the children were bonded and stable in their current placement and that removal would cause emotional harm. The superior court also took into account the older children's preferences to be adopted by the Dubovs, and the court found that the children were tied to the geographic region where the Dubovs live. Finally, there was evidence that the Dubovs maintained cultural ties with the children's

**45.** *Adoption of N.P.S.*, 868 P.2d 934, 936 (Alaska 1994).

**46.** *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 954 (Alaska 2000) (quoting *In re Adoption of F.H.*, 851 P.2d 1361, 1363–64 (Alaska 1993)).

**47.** *David S. v. State, Dep't of Health & Soc. Servs., Office of Children's Services*, 270 P.3d 767, 782 (Alaska 2012); *L.G.*, 14 P.3d at 954; *F.H.*, 851 P.2d at 1364.

**48.** Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67,584, 67,594 (Nov. 16, 1979).

**49.** *L.G.*, 14 P.3d at 955 (internal quotation marks omitted) (quoting *People ex rel. A.N.W.*, 976 P.2d 365, 369 (Colo.App.1999)).

**50.** *N.P.S.*, 868 P.2d at 936 (citing *F.H.*, 851 P.2d at 1363–64).

tribe, taking them to potlatch ceremonies, dance groups, and other social events.

In adopting the master's findings, the superior court correctly noted that OCS must show by clear and convincing evidence that good cause existed to deviate from placement preferences. Thus, the evidence was reviewed using the proper standard.[51] Although Paula points to a conflict in the evidence on the good cause finding, some of this evidence was never admitted in the hearings, and we thus afford it no weight.[52] Further, the simple existence of contradictory evidence does not mean that the master committed plain error when finding good cause to deviate from the ICWA placement preferences. Because ample evidence exists to support the superior court's decision, it was not plain error.

## V. CONCLUSION

For the foregoing reasons, we AFFIRM the superior court.

CARPENETI, Chief Justice, with whom STOWERS, Justice, joins, dissenting.

CARPENETI, Chief Justice, with whom STOWERS, Justice, joins, dissenting.

The court today upholds the removal of Indian children from their family and, with no notice by the State of critical hearings in the case to the family for over a year, the children's eventual placement with a non-Indian couple. Because the failure to provide notice to the children's family for over a year was a sharp violation of Alaska law, and because the State has not shown that these violations were harmless, I respectfully dissent from today's opinion.

Maddie is the mother of four Indian children; Paula is Maddie's mother and the children's grandmother. In 2006, when Maddie was a victim of domestic violence and struggled with alcohol abuse, the children were removed from her custody and placed with Paula. Although Maddie was able to regain custody of her children once, she relapsed and the children were returned to Paula. Maddie relinquished her parental rights in 2009, believing that Paula would adopt the children.

Alaska law includes strong protections for the rights of grandparents to have notice of hearings involving their grandchildren and to be heard at those hearings. Alaska Statute 47.10.030(d) provides that "the department shall give advance written notice of all court hearings in a child's case to a grandparent." Alaska Statute 47.10.080(f) provides that "the grandparents ... are entitled to notice of a permanency hearing under this subsection and are also entitled to be heard at the hearing." As the children's grandparent, Paula was entitled to notice of all hearings concerning the children and to be heard at those hearings. But in fact there were several hearings concerning the temporary placement of the children and the plans for their permanent placement that took place without any notice to Paula and consequently without her participation.

Paula argues that failing to provide her of notice of these hearings deprived her of the right to due process. "The crux of due process is opportunity to be heard and the right to adequately represent one's interests."[1] While conceding that Paula was entitled to notice and the right to be heard with regard to these proceedings, this court ultimately concludes that Paula is entitled to no relief

---

**51.** As to Paula's argument concerning impermissible burden shifting, the master correctly noted that AS 47.14.100(m) provides that the failure to qualify for a foster care license is prima facie evidence of good cause not to place a child with that adult. The master then noted that this applied to Paula because her foster care license was not renewed and she failed to overcome the presumption that she was not a proper placement. The master did not, however, require Paula to prove that there was good cause to deviate from ICWA placement preferences. Good cause to deviate from ICWA placement preferences is a distinct analysis from the decision to place with any particular person. *See In*

*re Adoption of Sara J.,* 123 P.3d 1017, 1019–20 (Alaska 2005) (affirming superior court's determination of good cause to deviate from ICWA placement preferences and allow three Indian children to be adopted by a Caucasian foster parent even where there were local tribal members willing to adopt the children).

**52.** *See Moffitt v. Moffitt,* 749 P.2d 343, 348 n. 4 (Alaska 1988).

**1.** *D.M. v. State, Div. of Family & Youth Servs.,* 995 P.2d 205, 213–14 (Alaska 2000) (quoting *Matanuska Maid, Inc. v. State,* 620 P.2d 182, 192 (Alaska 1980)).

because these violations were harmless—that is, she was not prejudiced by the lack of notice or that any prejudice was cured by later hearings for which Paula was given notice. Upon close examination, however, these conclusions are highly problematic. Paula's absence at the earlier hearings initiated a cascading stream of consequences that severely undercut her ability, over a year later (when she was finally notified what was happening), to present her case for placement of her grandchildren with her.

There were two permanency hearings, one in August 2009 and one in July 2010, and a placement hearing, in September 2010, for which Paula did not receive notice. I examine each in turn.

### The August 2009 Permanency Hearing

In August of 2009 Paula, having just returned from her trip to Montana to care for her ailing mother, expected that the children would be placed back with her. The State, having given credence to tribal criticisms of Paula coming through Tribal Administrator Dubov, was at that time moving away from Paula as a placement option. A permanency hearing is required by Alaska law[2] to insure that children do not drift in foster care[3] and thus the August 2009 permanency hearing was extremely important to the direction that the children's case would take.

At the hearing OCS set out both the case against Paula and the case favoring placement with the Dubovs. Several critical points were established at this hearing: First, OCS reported that it had received a report of harm concerning the children "occur[ing] right before [they were] removed from [their] grandmother." Next, it was stated that the parents had relinquished their parental rights and that the permanent goal was adoption for the children. OCS then reported that "the [Dubovs] are doing a

---

**2.** CINA Rule 17.2(e), (f), and (i) provide:

(e) Findings. The court shall make written findings, including findings related to
(1) whether the child continues to be a child in need of aid;
(2) whether the child should be returned to the parent or guardian, and when;
(3) whether the child should be placed for adoption or legal guardianship and whether the Department is in compliance with AS 47.10.088(d) relating to the filing of a petition for termination of parental rights;
(4) whether the child should be placed in another planned, permanent living arrangement and what steps are necessary to achieve the new arrangement; and
(5) in the case of a child who has attained age 16, the services needed to assist the child to make the transition from foster care to independent living or adult protective services.
. . . .
(f) Additional Findings. In addition to the findings required under subsection (e), the court shall also make written findings related to
(1) whether the Department has made reasonable efforts required under AS 47.10.086 or, in the case of an Indian child, whether the Department has made active efforts to provide remedial services and rehabilitative programs as required by 25 U.S.C. Sec.1912(d);
(2) whether the parent or guardian has made substantial progress to remedy the parent's or guardian's conduct or conditions in the home that made the child a child in need of aid;
(3) if the permanency plan is for the child to remain in out-of-home care, whether the child's out-of-home placement continues to be appropriate and in the best interests of the child; and
(4) whether the Department has made reasonable efforts to finalize the permanency plan that is in effect (whether the plan is reunification, adoption, legal guardianship, placement with a fit and willing relative, or placement in another planned permanent living arrangement).
. . . .
(i) Subsequent Review. The court shall hold a hearing to review the permanency plan at least annually until successful implementation of the plan.

**3.** Permanency hearings are crucial complements of the court's oversight of children in OCS custody. "A permanency hearing must be held: (1) within twelve months after the date the child entered foster care as calculated under AS 47.10.088(f); (2) within thirty days after the court determines pursuant to CINA Rule 17.1 that reasonable efforts are not required; or (3) upon application by a party, when good cause is shown." *N.A. v. State*, 19 P.3d 597, 602 (Alaska 2001) (internal citations omitted). The court must hold review hearings at least annually. AS 47.10.080(*l*)(5). Under the CINA rules permanency hearings require several important judicial findings that are crucial to the overall direction and development of the child's care. Permanency hearings are held where there are significant changes in the direction of the child's case. For instance, where OCS seeks to discontinue making reasonable efforts to provide family support services, a permanency hearing should be held. *Audrey H. v. State, Office of Children's Servs.*, 188 P.3d 668, 675–76 (Alaska 2008).

fine job with the kids." Finally, it was indicated that "grandmother is okay with the plan now."

Had Paula been present at this hearing, she doubtless would have contested every one of these assertions. As to the "removal" of the children, she testified—in November 2010 when she was finally given her right to be heard—that the children were not removed from her in the summer of 2009 but rather she requested temporary respite care while she traveled to Montana to care for her mother. As to the report of harm, she would have been able to present her response to it. As to Maddie's relinquishment, she would have notified the court that Maddie had relinquished *with the expectation that the children would be going to Paula,* as was evident from Maddie's attempt to withdraw her relinquishment only 14 days after signing the papers and Paula's testimony. As to the permanent goal of adoption, the suggestion that the Dubovs were doing fine, and that Paula was "okay with the plan," Paula would have been on notice that OCS was firmly moving away from her as the adoptive placement and toward the Dubovs and she would have had the chance to voice her objection to that development.

Today's opinion concludes that Paula's absence at this hearing did not prejudice her because the placement decision would not have changed at this hearing given the concerns raised about Paula's parenting resulting in the loss of her foster care license. But this rationale actually serves to underscore the prejudice she suffered: Charges were raised about her parenting that she knew nothing about for over a year. Paula of course knew about her licensure problem, but believed that she was working with OCS to correct that problem. Then, when Paula was finally given notice and told of her right to appeal OCS decisions, the standing master relied heavily on her absence at the earlier hearing and her failure to seek placement for over a year:

> Only when ... placement [with a relative in Montana] was determined not to be in the best interest of the kids ... only then, 14, 15, 16 months after you were told by Lori Wikle and Valerie Nelson in person

[that the children would not be returned] when you got back from Montana, only then did you contact Lori and ask to have placement back with you.

But Paula presented evidence that suggests she tried to have the children placed with her when she returned from Montana. She thought she was working with OCS to overcome the problems with her foster care license:

> Q. Did you reapply for your foster care license ... ?
> A.... I figured I had to work with OCS and find out what was going on and what the process was to even get the children back.
> ....
> Q.... [You] didn't ask for placement of the children at that time because you were trying to work with everybody and be cooperative?
> A. Well, yeah. Wouldn't that be the first step in trying to regain something?

Thus, at the very time the court was being told that the "grandmother is okay with the plan," Paula was trying to regain custody of the children and was unaware of OCS's plan to place them with the Dubovs. Not only was she unable to voice this to the court, she thought she was on the path towards reunification. Given Paula's continued desire to have the children with her and OCS's continued involvement with Paula, such as encouraging supervised visits and stopping by her house to discuss the children, it is highly problematic to conclude that Paula's absence from this hearing did not prejudice her.

The court's conclusion is problematic for another reason. The court notes that very little changed at the August 2009 permanency hearing because the permanency plan remained adoption. But this ignores the reality that the prior permanency plan was approved in the context of *Paula* acting as the foster parent, that is, as the putative adoptive parent. At the August 2009 hearing the court found that placement with *the Dubovs* was in the best interests of the children. The court had thus moved away from adoption by Paula and toward adoption by the Dubovs. Paula was prejudiced by her absence.[4]

4. Six months later, at a time when OCS still had

not provided Paula proper notice of her rights as

*The July 2010 Permanency Hearing*

The July 2010 permanency hearing was a second opportunity for Paula to indicate to the court that she was interested in caring for the children and to learn the steps necessary for her to do so. That it was an important opportunity lost is evident from the standing master's later reliance on Paula's inaction in ruling against her. As noted above, the standing master stated that Paula waited too long to seek placement of the children with her. In addition, at this hearing the court indicated that the local tribe supported placement with the Dubovs, certainly a significant factor influencing the ultimate decision. Accordingly, Paula's absence from this hearing weakened her case and prejudiced her.

Her absence was critical in another way. At this hearing, additional negative information concerning Paula was brought to the attention of the court. Not being present, Paula was unaware of the allegations and unable to defend herself.

*The September 2010 Placement Hearing*

The placement hearing of September 2010 was held to review OCS's decision to deny placement of the children with a maternal aunt under AS 47.14.100(m). Although the focus of the hearing was on that decision, substantial evidence that Paula was an unsuitable placement was also developed at this hearing. Today's opinion concludes that Paula did not suffer any prejudice from her absence at this hearing because she was able to present evidence at her own placement hearing later. Although Paula was given the opportunity to try to meet the evidence presented at the September 2010 hearing months later in her own placement hearing, it does not follow that Paula suffered no prejudice from her earlier absence.

First, it is questionable whether any of the evidence against Paula would have even surfaced at the September 2010 hearing had Paula been present. It was irrelevant to the nominal purpose of the hearing: consideration of the maternal aunt's placement request. (Indeed, that request had been withdrawn before the hearing even commenced.) Second, Paula was unable immediately to rebut the significant amount of testimony regarding her failure to properly care for the children. Accordingly, the case against Paula that had been building for over a year without her knowledge was locked in for another two months before she had the opportunity to respond. Third, the chance to present contrary testimony months later is a poor substitute for notice and the right to be heard at the principal hearing. The burdens of locating the testimony in the record, listening to it, understanding it in the context in which it was presented live, and responding to it would pose substantial logistical problems for any litigant. These problems are magnified by the reality in rural Alaska that hearings are often held with witnesses, attorneys, parties, and judges in different locations.[5] In sum, Paula's presence would have markedly altered her ability to present her case.

*Conclusion*

I cannot conclude that Paula was not prejudiced by being kept in the dark for over a year about the direction that the case was taking—away from placement with her because of damaging allegations about her and toward placement with the Dubovs—while the impression that Paula did not care about the children's placement grew and the children bonded with their new foster family. In *State v. Jacob (Jacob II )*,[6] we stated that

---

a grandparent, it sought to further prevent her from contacting the children. After terminating Paula's daycare services and requiring supervised visits, in February 2010 OCS filed and received a temporary protective order preventing Paula from going to the children's school and requiring her to stay 500 feet away from the children. OCS also implemented a no-contact order for Paula and the children's biological mother. Although OCS ultimately did not pursue the protective order, this is another example where Paula was unaware of any rights she may have had to contest OCS decisions. Paula's case

for placement of the children was undermined by her absence from the earlier hearing.

5. In this case, for example, Paula was in one location; her attorney was in another location; the OCS social worker, the assistant AG, the guardian ad litem, and counsel for the guardian, were in another location; a witness was in another location; the representative of the Northern Cheyenne Tribe was in another location; and the court was in Glennallen.

6. 214 P.3d 353 (Alaska 2009).

the "placement of children and the involvement of grandparents in their grandchildren's lives are not matters to be taken lightly." [7] We have also noted that

> notice of proceedings and a meaningful right to be heard are essential to due process, and ... there are situations in which the right to intervene in the late stages of a CINA case will be insufficient to cure the prejudice of the initial due process violation. Timely notice and an opportunity to be heard are especially important in situations involving the placement of children.[8]

*Jacob* involved the right of grandparents to be notified of proceedings involving their grandchildren. Paula's involvement was not only as a grandparent but also as a foster parent. She should have been given a fair opportunity to defend her performance as a foster mother and to know the State's changing plans regarding placement of her grandchildren—away from adoption by her and toward adoption by the Dubovs.[9]

We have been troubled many times in recent years by the State's failure to meet its statutory requirements concerning handling of children's cases. For example, in the areas of giving notice to grandparents,[10] making active efforts to reunify the Indian family,[11] and giving notice of the planned evidentiary showing ultimately to be used to terminate parental rights,[12] we have expressed our concerns about the State's performance. Ultimately, however, we have upheld the State's action, concluding that overall the State's efforts were good enough or that despite the failure to comply with the statute there was no prejudice to the losing party. I cannot join in this approach in the case before us.[13] I believe that Paula was prejudiced by the State's failure to notify her of three consecutive hearings over the space of fifteen months during which the placement of her grandchildren was effectively being decided; certainly the State has not demonstrated the lack of prejudice.

Given the factual and legal context of this case, including concerns regarding evidence available in the record but not properly admitted [14] and the role of Mr. Dubov in convincing OCS to look for a placement other

---

7. *Id.* at 362.

8. *Jacob v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* (*Jacob I*) 177 P.3d 1181, 1185 (Alaska 2008).

9. And recently we held that an Indian grandmother's due process rights were violated (or that she suffered prejudicial unfairness) when she had no notice for two years of an issue raised by the State for the first time in final argument at trial. *Amber B. v. State of Alaska, Dep't of Health & Soc. Servs., Office of Children's Servs., Arlene B. v. State of Alaska, Dep't of Health & Soc. Servs., Office of Children's Servs.,* Mem. Op. & J. No. 1418, 2012 WL —— (Alaska, April, 16, 2012).

10. *Jacob I,* 177 P.3d at 1186.

11. *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 212 P.3d 756, 766 (Alaska 2009) (failure to meet active efforts duty while father was in jail but overall efforts sufficient); *Marina B. v. State, Office of Children's Servs.,* Mem. Op. & J. No. 1327, 2009 WL 225711 *8 (Alaska, Jan. 28, 2009) ("[W]e cannot condone the low level of OCS's efforts after this point."); *T.F. v. State, Dep't of Health & Soc. Servs.,* 26 P.3d 1089, 1093 (Alaska 2001) ("We in no way condone DFYS's contribution to the delay in paternity testing."); *see also A.A. v. State, Dep't of Family & Youth Servs.,* 982 P.2d 256, 262 (Alaska 1999) (noting court "did not condone the State's failure to work out a case plan); *A.M. v. State,* 945 P.2d 296, 306 (Alaska 1997) (noting court

"troubled by" passivity of State's remedial efforts).

12. *D.M. v. State, Div. of Family & Youth Servs.,* 995 P.2d 205, 210 (Alaska 2000) ("We do not condone the timing of the state's request.").

13. Today's opinion mistakenly assumes that the dissent adopts a "last-straw jurisprudence" out of frustration with OCS's previous failures, and somehow ties the results in those cases to this case. That is not correct. The string of troubling cases in the past is cited to emphasize the difference between those cases and this case: In those cases OCS's violations were not determinative of the outcome, while here they are. This is evident from the language used to express this concept: "I cannot join in this approach *in the case before us.*"

The court also notes that Paula has not challenged the master's findings made after the hearing at which she was finally given notice and allowed to be heard. But she is entitled to a reversal on the basis of the claim she has brought.

14. A review of the record reveals several documents that supported Paula's positions on various issues, including several OCS emails that confirmed her factual assertions and the home study. But for reasons that are unclear these exhibits were not admitted into evidence in the course of the hearing. Accordingly, under the rule of *Moffitt v. Moffitt,* I give no weight to those

than Paula,[15] I conclude that the State has not shown that OCS's failure to provide Paula notice of several important hearings did not prejudice her. For these reasons, I respectfully dissent from today's opinion. I would hold that Paula's due process rights were violated.[16]

exhibits. 749 P.2d 343, 347 n. 4 (Alaska 1988). Nonetheless, it is deeply troubling that while Paula was already sharply behind the curve in presenting evidence to the court, her trial attorney did not take steps to offer exhibits that supported her case. Paula's attorney may have failed to offer these documents because she was unable to fully grasp the weight of the adverse testimony presented at the September hearing, at which Paula and her attorney were not present because Paula was given no notice of the hearing.

15. Dubov was the tribal administrator who wrote letters critical of Paula's parenting and who eventually obtained custody of Paula's grandchildren. His position of power may have further exacerbated the prejudice she suffered, because he had access to both the court and OCS and it appears he played a critical role in the decision to remove the children and to suspend Paula's daycare services.

16. I would remand this case to the superior court for further proceedings consistent with the holding that Paula's due process rights were violated. This might include her right to re-open the children's adoption case. (That case is not before us, but both parties have indicated that the adoptions have gone forward.)

Case law from this court and the United States Supreme Court point to such a remedy. Where a lack of notice led to a denial of due process to grandparents, we have held that a tribal court adoption should be overturned three years after it had been approved and new birth certificates issued by the State. *Starr v. George*, 175 P.3d 50 (Alaska 2008). The United States Supreme Court has taken a similar approach: In *Mississippi Band of Choctaw Indians v. Holyfield*, the Court noted that serious violations may warrant changes in placement, even though such changes can cause "considerable pain" and "potential anguish." 490 U.S. 30, 53–54, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989).

I would afford Paula a full best interests hearing were she to challenge the adoptions. At that hearing, in order to place her and the children in as close as possible to the positions they would have occupied had Paula been given notice, I would preclude consideration of evidence of the children's bonding with the Dubovs in the period since Paula was deprived of her rights.

Whether the outcome of such a hearing would be different from the outcome of the earlier hearings at which Paula was not present cannot be known at this time. But it is clear that the earlier hearings involved substantial evidence concerning bonding between the children and the Dubovs.