**2017 UT App 159**

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF P.F.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

G.F.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20160247-CA
Filed August 24, 2017

Fifth District Juvenile Court, St. George Department
The Honorable Paul E. Dame
No. 1032776

Benjamin D. Gordon and Kristopher D. Pearson,
Attorneys for Appellant

Sean D. Reyes, Carol L.C. Verdoia, and John M.
Peterson, Attorneys for Appellee

Martha Pierce, Guardian ad Litem

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES J. FREDERIC VOROS JR. and KATE A. TOOMEY concurred.[1]

MORTENSEN, Judge:

¶1 Appellant G.F. (Mother) challenges the juvenile court's
order terminating her parental rights to P.F. (Child). Mother
argues that Child should have been placed with family or a

---

1. Judge J. Frederic Voros Jr. participated in this case as a
member of the Utah Court of Appeals. He retired from the court
before this decision issued.

member of her tribe as prescribed in the Indian Child Welfare Act (ICWA), that the juvenile court should have relied on her expert's testimony to determine whether the State made active efforts under ICWA, and that the juvenile court erroneously denied her motion to invalidate a July 2014 custody order. We affirm.

BACKGROUND

¶2    Child was born in 2008, when Mother was thirteen years old. Mother lived with her mother (Grandmother) and father (Grandfather) at the time. She became pregnant from being raped when she was twelve by Grandmother's boyfriend. Mother did not receive counseling when she became pregnant and only reported the rape to counselors in 2014.

¶3    Child was originally adjudicated as neglected in 2010 based on Mother's history of substance abuse and domestic violence. Child was again adjudicated as neglected in June 2014 based on an incident where Mother slashed and stabbed Child's stepfather (Stepfather) with a knife.[2]

¶4    The court issued a warrant to take Child into protective custody on June 3, 2014. On June 5, it held an expedited review hearing because both Mother and Stepfather[3] were incarcerated. Child was then under the care of Grandfather and Grandmother. Due to concerns of substance abuse, the court ordered Grandmother and Grandfather to submit to drug testing. Grandfather complied with the order for drug testing, but Grandmother refused. Accordingly, on June 6, the Division of

---

2. Mother described this incident, saying she "scratched and poked [Stepfather] with a letter opener."

3. By June 8, 2014, Mother and Stepfather had divorced. Accordingly, Stepfather was dismissed from the proceedings.

Child and Family Services (DCFS) took Child into protective custody.

¶5     During an adjudication hearing on June 18, 2014, counsel for Mother informed the court that Child "may be eligible for enrollment in the Oklahoma Cherokee Tribe and ICWA may apply." At the time, neither Child nor Mother was an enrolled member of the Cherokee Nation. On July 8, 2014, the court adjudicated Child neglected based upon Mother's incarceration for failing to appear on her domestic violence charge and for her recent use of amphetamine, methamphetamine, and bath salts (the Custody Order). The Custody Order placed Child in DCFS custody.

¶6     The State had sent formal notice of the proceedings to the Cherokee Nation on June 23, 2014. The Cherokee Nation responded by letter and indicated that Child was "eligible for enrollment with Cherokee Nation by having direct lineage to an enrolled member." The letter also stated, "At this time, [Child] does not meet the definition of 'Indian child' in relation to the Cherokee Nation as stated in [ICWA]." The Cherokee Nation acknowledged in the letter that it "d[id] not have standing to intervene . . . until [Child] or eligible parent(s) receive membership."

¶7     DCFS placed Child in foster care. She has been with her current foster family since July 2014. Child's foster parents are not related to Mother and are not members of the Cherokee Nation. Child's therapist testified that Child had behavioral issues and that many of these issues, such as biting herself when she was under stress, abated while she was under the care of her foster family. Although Grandfather intervened in the matter and asked that Child be placed with him—in the same household from which Child had been removed and where both Mother and Grandmother were still living—Child was never placed with Grandfather.

¶8     Mother's reunification efforts were unsuccessful. The court ordered treatment that required her to complete

assessments for domestic violence, mental health, and drug abuse and to comply with any recommendations. It also ordered Mother not to consume alcohol or use drugs, to continue drug testing, and to maintain stable housing and employment. In March 2015, the court held Mother in contempt for failing to comply with drug testing, failing to attend domestic violence classes, and failing to begin substance abuse treatment.

¶9 In April 2015 the State petitioned to terminate Mother's parental rights.[4] The State sent a second notice to the Cherokee Nation in May 2015, to which the Cherokee Nation responded as it did in its first letter, specifically noting that neither Child nor Mother was enrolled with the Cherokee Nation and that Child therefore did not qualify as an Indian child under ICWA. The court ordered another treatment plan in June 2015 under which Mother was promptly held in contempt for going to Child's school without permission.

¶10 On July 20, 2015, Mother and Child were enrolled as members of the Cherokee Nation. Mother filed notice of membership with the court on July 21, 2015. Recognizing Child's enrollment in the Cherokee Nation, the court continued the termination trial, originally scheduled for August 2015, to October 2015. The State filed a third notice with the Cherokee Nation on August 3, 2015. The Cherokee Nation moved to intervene on August 10, 2015, and the State provided it with copies of the pleadings and orders filed in the proceedings.

¶11 In September 2015, Mother filed a motion asking the court to order ICWA-compliant placement and requesting that Child be removed from foster care and placed with Grandfather. The State objected, arguing that Grandfather was not a viable

---

4. Child's father's parental rights are not at issue in this appeal. The State's petition sought to terminate the parental rights of both parents, and the father's rights were terminated after he failed to appear.

placement option,[5] that Child would be emotionally traumatized by another change in placement, and that the Cherokee Nation waited an unreasonably long amount of time to enroll Child and to intervene. Mother filed a separate motion to invalidate the Custody Order, arguing that it did not comply with ICWA. The State opposed that motion also, arguing that ICWA did not apply when that order was issued. In October 2015, the court denied Mother's motion to invalidate the Custody Order and held the termination trial.

¶12   At the conclusion of the trial, the juvenile court entered thirty-one pages of factual findings. Mother does not challenge any of these findings. Concerning the removal of Child from her foster home, the juvenile court found that Child "has experienced multiple traumas" due to the domestic violence and drug use she witnessed from her immediate family. The court found, based on the testimony of Child's therapist, that "[r]emoving the child from her current foster home may cause her further trauma and harm, [and] may also cause her to regress, returning to self-harming, dishonesty, and a lack of trust. This is, in part, due [to] the child's history with prior removals, and the healthy relationship and attachments the child has developed with the foster parents." The juvenile court also recognized the opinion of the State's ICWA expert that "it would definitely be detrimental to the child to remove her from the foster home. The child is bonded with and familiar with the foster family." While Mother's expert testified that removing Child from the foster family would not result in any emotional harm because "children are resilient and can bond very easily," the juvenile court did not appear to give this testimony much, if any, weight.

¶13   The juvenile court also made meticulous findings on the efforts DCFS made to facilitate reunification between Child and

---

5. Grandfather was adjudicated as having neglected Mother in 2010.

Mother. We recite only the findings relevant to Mother's appeal, namely, the facts surrounding the court's treatment of the parties' expert witnesses. The State's expert was a DCFS caseworker with experience working on ICWA cases in Utah, Arizona, and Alaska involving eight to nine Indian tribes. He had six years of experience as an ICWA expert and familiarized himself with Cherokee customs in preparation for this case. The State's expert was not a member of any tribe. During the course of this case, the State's expert met with Child approximately fifty times and with Mother ten times. He testified that he believed the State had made "active efforts" to prevent the breakup of Indian families pursuant to ICWA.

¶14    Mother's expert is a member of the Cherokee Nation and an ICWA expert. In the last two years he has testified as an ICWA expert twenty times. Mother's expert had never met Child but had spoken to her briefly over the phone. He had never met or spoken with Mother. Mother's expert testified that he believed the State's actions did not rise to the level of active efforts. Mother's expert likened active efforts to leading a horse to water and then making it drink, even by pushing its head into the water. He admitted he was unaware of the numerous mental health services previously provided to Mother. He also testified that he believed DCFS should retain custody, that consideration of termination should be postponed, and that reunification services should be extended for another three to six months.

¶15    The juvenile court concluded that there was good cause to deviate from the ICWA placement preferences and allow Child to remain with her foster family. The court specifically referenced the "multiple traumas" Child had suffered, the nearly two years she had lived with, improved with, and bonded with the foster family, and concluded that removing Child from the foster family would cause her further trauma and harm and may cause her to "regress to self-harming, dishonesty, and a lack of trust." The court also concluded that no other person who would constitute a suitable ICWA-eligible placement sought custody of Child.

¶16 The juvenile court further concluded that the State had "provided active efforts throughout this case to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family, and these efforts [had proven] unsuccessful." It reasoned that the State had provided Mother with many opportunities to address her problems and seek reunification with Child but that Mother failed in her efforts.[6] The court further noted that Mother's expert "gave testimony related to the issue of active efforts in this case" but that it "did not find him to be credible or persuasive on the issue."

¶17 Based on these findings and conclusions the juvenile court terminated Mother's parental rights and did not remove Child from her foster family. Mother appeals.

ISSUES AND STANDARDS OF REVIEW

¶18 Mother presents three questions for review, none of which attacks the juvenile court's factual findings.[7] First, Mother argues that the court erred in concluding that "Child's bond with the non-Native foster family" could "reach the standard of good cause" to depart from the placement preferences under ICWA. Second, Mother contends that the court erred in determining that the State made active efforts under ICWA to prevent the breakup of the Indian family by "crediting the

6. Mother agreed that she fought DCFS "tooth and nail" throughout the case. At one point Mother had "fightcps.org" written on the window of her car in reference to child protective services.

7. During oral argument, Mother's counsel confirmed that Mother was not disputing any findings of fact, but instead was only contesting whether ICWA should have been or was properly applied.

State's ICWA expert who was not versed on Cherokee traditions and culture above the Cherokee Nation's actual ICWA expert." Third, Mother contends that the court erred in denying her motion to invalidate the Custody Order because the ICWA placement preferences applied when Mother provided notice to the court that Child may be eligible for enrollment.

¶19    "We review the juvenile court's factual findings for clear error and its conclusions of law for correctness, affording the court some discretion in applying the law to the facts." *In re C.D.*, 2008 UT App 477, ¶ 7, 200 P.3d 194 (brackets, citation, and internal quotation marks omitted). "[L]egal errors . . . are usually an abuse of discretion." *Schroeder v. Utah Attorney Gen.'s Office*, 2015 UT 77, ¶ 49, 358 P.3d 1075.


ANALYSIS[8]

I. Good Cause to Deviate from the ICWA Placement Preferences

¶20    The first issue that Mother brings on appeal is whether "Child's bond with the non-Native foster family" can "reach the standard of good cause" to depart from the ICWA placement preferences. We conclude that Child's bond with her foster family can reach the good-cause standard.

¶21    ICWA establishes uniform "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes." 25

---

8. The United States Department of the Interior issued new regulations, effective December 12, 2016, for the uniform application of ICWA. *See* 25 C.F.R. §§ 23.101, 23.143 (2016). Because all relevant dates in this proceeding are prior to the effective date of the new regulations, we do not use them in our analysis.

U.S.C. § 1902 (2012). Section 1915(b)[9] of ICWA governs placement preferences for the foster or preadoptive placement of an Indian child. The statute provides,

> In any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with—
>
> > (i) a member of the Indian child's extended family;
> > (ii) a foster home licensed, approved, or specified by the Indian child's tribe;
> > (iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or
> > (iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.

*Id.* § 1915(b). The term "good cause" is not defined in the statute but "was designed to provide state courts with flexibility in determining the disposition of a placement proceeding involving an Indian child." *In re adoption of Sara J.*, 123 P.3d 1017, 1027, (Alaska 2005). The nonbinding Bureau of Indian Affairs (BIA) Guidelines in effect during the pendency of this proceeding state that good cause must be based on one or more of the following: (1) the request of the parents; (2) the request of the child; (3) extraordinary physical or emotional needs of the child; or (4) unavailability of a preferred placement. *See* Guidelines for State Courts and Agencies in Indian Child Custody Proceedings,

---

9. There is some discussion in the parties' briefs on whether the termination order invoked section 1915(a) or section 1915(b). Section 1915(b) of ICWA applies to preadoptive or foster placement, while section 1915(a) applies to adoptive placement. Our analysis is the same under either section.

80 Fed. Reg. 10,146, 10,158 (Feb. 25, 2015). Courts have applied other factors in addition to those provided in the Guidelines, including the Indian child's bonding with nonpreferred foster parents, *In re Alexandria P.*, 176 Cal. Rptr. 3d 468, 494 (Cal. Ct. App. 2014), preservation of sibling relationships, *Fresno County Dep't of Children & Family Services v. Superior Court*, 19 Cal. Rptr. 3d 155, 169 (Cal. Ct. App. 2004), and the best interests of the child, *Paula E. v. Department of Health & Social Services, Office of Children's Services*, 276 P.3d 422, 437 (Alaska 2012).

¶22    In *In re C.D.*, 2008 UT App 477, 200 P.3d 194, this court discussed, but did not resolve, whether bonding with a foster family may be considered for establishing good cause to deviate from the ICWA placement preferences. *Id.* ¶ 48 & n.29. While analyzing whether the court had jurisdiction to hear the appellant's argument on placement preferences, this court reasoned that compliance with the ICWA preferences should be reviewed at the dispositional hearing to achieve compliance as soon as possible. *Id.* ¶ 49. We noted, "When foster placement is noncompliant and of extended duration, the very success of the placement is in conflict with the goals of the ICWA. Indeed, the Indian child's attachment to her foster parents may later be offered as good cause to avoid the ICWA preferences altogether." *Id.* ¶ 48 (citing *In re adoption of F.H.*, 851 P.2d 1361, 1362, 1364–65 (Alaska 1993)). This court further observed, "Not all courts accept bonding with a non-Indian foster family as good cause for deviating from the ICWA preferences. . . . [W]e are mindful that separating children from a relatively long-term foster placement may be traumatic to children who have already suffered abuse or neglect." *Id.* ¶ 48 n.29.[10]

---

10. The Utah Supreme Court also briefly addressed the bond between a child and foster family in an ICWA proceeding in *In re adoption of Halloway*, 732 P.2d 962 (Utah 1986). In that case, the court stated, "While stability in child placement should be a paramount value, it cannot be the sole yardstick by which the

(continued…)

¶23    Courts that have rejected bonding with non-Indian foster families as good cause have generally done so where the initial placement of the child did not comply with ICWA. *See, e.g.*, *In re Desiree F.*, 99 Cal. Rptr. 2d 688, 700 (Cal. Ct. App. 2000) ("Factors flowing from [an Indian child's] current placement in flagrant violation of the ICWA, including but not limited to bonding with her current foster family and the trauma which may occur in terminating that placement, shall not be considered in determining whether good cause exists to deviate from the placement preferences set forth in the ICWA."); *In re C.F.*, No. 03-0961, 2004 WL 1396159, para. 4 & n.2 (Iowa Ct. App. June 23, 2004) (concluding that difficulty in transition to a new placement is not good cause to deviate from placement preferences and admonishing the State of Iowa that, had proper procedure been followed, the child would initially have been placed with an Indian family and the difficulty would have been alleviated); *see also In re adoption of M.T.S.*, 489 N.W.2d 285, 288 (Minn. Ct. App. 1992) (holding that the bond between child and foster family is not good cause to depart from preferences without discussing whether the initial placement with the non-Indian foster family was compliant with ICWA). These holdings are in line with this court's view in *In re C.D.* that "[w]hen foster placement is *noncompliant* and of extended duration, the very success of the placement is in conflict with the goals of the ICWA." *In re C.D.*, 2008 UT App 477, ¶ 48 (emphasis added). Indeed, the nonbinding BIA Guidelines make the same distinction, stating that "extraordinary physical or emotional needs of the child do[] not include ordinary bonding or attachment that may have occurred as a result of a placement or the fact that the child has, for an extended amount of time, been

---

(…continued)
legality of a particular custodial arrangement is judged. Such a standard would reward those who obtain custody, whether lawfully or otherwise, and maintain it during any ensuing (and protracted) litigation." *Id.* at 971–72 (citation omitted).

in another placement *that does not comply with the Act*." Guidelines, 80 Fed. Reg. at 10,158 (emphasis added).

¶24   On the other hand, many courts have been willing to consider the bond between a foster family and child where the initial placement did not violate ICWA. *See Navajo Nation v. Arizona Dep't of Econ. Sec.*, 284 P.3d 29, 36 (Ariz. Ct. App. 2012) ("We have determined that in finding good cause under ICWA, a court may appropriately consider a child's bonding and attachment to a family and any emotional distress the child would experience if removed."); *In re Nery V.*, 864 N.W.2d 728, 737 (Neb. Ct. App. 2015) (concluding that the State of Nebraska had shown good cause where no other suitable placement was available for over three years while children thrived in a non-Indian foster home). In *In re Alexandria P.*, the court reasoned, "[T]he bond between Alexandria and her caretakers and the trauma that Alexandria may suffer if that bond is broken are essential components of what the court should consider when determining whether good cause exists to depart from the ICWA's placement preferences." 176 Cal. Rptr. 3d at 494. The *In re Alexandria P.* court held that the trial court erred when it relied on *In re Desiree F.*, *id.*, a case that we discussed above as an example of when bonding does not reach good cause, *supra* ¶ 23. The *In re Alexandria P.* court noted,

> In *Desiree F.*, the social services agency was responsible for the delay in notifying the tribe of the proceedings, and the appellate court clarified that on remand, the trial court could not consider factors flowing from the agency's "flagrant violation" of the ICWA, including any bond the minor developed with the current foster family. In the present case, the Department acted promptly to notify the tribe, and the social worker was in communication with the tribe even before Alexandria was placed with the [foster family]. Thus, no ICWA violation precludes the court from

considing the bond that Alexandria has with her foster family.

176 Cal. Rptr. 3d at 494 (citation omitted).

¶25 Distinguishing between compliant and noncompliant foster placement makes sense. In a situation where the child should not have been placed with a particular foster family in the first instance, the purposes of ICWA are frustrated. To then allow the bonding that occurs to ratify that error could potentially lead to abuses of process. But where the initial placement with a foster family complies with ICWA, there is no reason that a child's bond with her foster family, and the potential trauma inflicted "to children who have already suffered abuse or neglect," *In re C.D.*, 2008 UT App 477, ¶ 48 n.29, should not be part of a court's good-cause determination.[11]

¶26 Here, whether the juvenile court abused its discretion by weighing Child's bond with her foster family can be resolved by determining whether her initial placement with her foster family complied with ICWA. We conclude that an ICWA placement was not required in the Custody Order and that Child's bond with her foster family was properly weighed in the termination proceedings.

¶27 ICWA and its placement preferences apply to adoptive, foster, or preadoptive placement of an "Indian child." 25 U.S.C. § 1915(a), (b) (2012). ICWA defines "Indian child" as "any unmarried person who is under age eighteen and is either (a) a

---

11. We do not address whether there is any factual setting where it would be appropriate to consider a child's bond with her foster family when that bond flows from an erroneous placement. In any event, good cause is a determination, made on a case-by-case basis, to which we grant juvenile courts some deference when applying the law to the facts. *In re C.D.*, 2008 UT App 477, ¶ 7, 200 P.3d 194.

member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." *Id.* § 1903(4).

¶28    In this case, Child was not an Indian child under ICWA at the time she was placed with her foster family. Child was placed in DCFS custody in June 2014 and has been with her foster family since July 2014. Child was not enrolled as a member of the Cherokee Nation until July 2015.[12] And although the Cherokee Nation stated in its June 2014 letter that Child was *eligible* for membership, her eligibility changed her status only if Mother was enrolled as a member of an Indian tribe. And Mother was not enrolled as a member of a tribe until July 20, 2015.[13] Thus, Child was not, for ICWA purposes, an "Indian child" when the Custody Order was entered, because she was neither "a member of an Indian tribe" nor "eligible for membership in an Indian tribe *and . . .* the biological child of a member of an Indian tribe." *Id.* (emphasis added). Therefore, ICWA did not apply in July 2014 when Child was placed in DCFS custody and the original placement of Child with her foster family did not run afoul of ICWA.[14] *See In re A.G.-G.*, 899 P.2d 319, 321 (Colo. App. 1995) ("Until the party asserting the applicability of the ICWA establishes, on the record, that the child [is an Indian child], the ICWA is not applicable."); *see also In re D.L.S.*, 2000 UT App 142U, paras. 2, 4 (affirming the trial

12. The original termination trial was scheduled for August 3, 2015.

13. Mother does not argue or suggest that Child's biological father was a member of any tribe.

14. In fact, the Cherokee Nation, which makes the "ultimate determination of whether a child is a member," *see In re M.J.*, 2011 UT App 398, ¶ 25, 266 P.3d 850, stated, "[Child] does not meet the definition of 'Indian child' in relation to the Cherokee Nation as stated in [ICWA]," *supra* ¶ 6.

court's determination that ICWA did not apply where a letter from the tribe indicated the children were eligible for membership but neither of the children's biological parents were members of a tribe).

¶29    Mother argues that "[a]t the onset of the case, the juvenile court was informed that [Child] was eligible for enrollment in the Cherokee Nation" and that because the juvenile court had "reason to know" that Child was an Indian child in June 2014, the court should have made "changes in [Child's] custody at that time." Mother's conclusion overstates the requirements under ICWA's reason-to-know provision. When a court has "reason to know that an Indian child is involved," the State must "notify the parent . . . and the Indian child's tribe." 25 U.S.C. § 1912(a) (2012). Here, it is not clear that Mother's mere assertion at the June adjudication hearing—not even asserting that Child *was* an Indian child, but that she *may be eligible for enrollment*—was enough to trigger ICWA's reason-to-know provision. *See In re M.J.*, 2011 UT App 398, ¶ 31, 266 P.3d 850 ("[W]e agree with the many courts that have determined that vague, unsupported, last-minute, or incredible assertions of Indian ancestry are not sufficient to invoke ICWA's notice provisions."). But even assuming it was, the State sent notice immediately and periodically to the Cherokee Nation, twice receiving confirmation that Child was not an Indian child under ICWA. There is no statutory requirement to implement the ICWA placement preferences when the State has reason to know that a child may be an Indian child; the only requirement is to provide notice to the child's custodians and tribe. *See id.* (characterizing ICWA's reason-to-know provision as a notice provision). Further, any question of whether Child qualified under the statute was settled by the Cherokee Nation in its June 2014 letter stating that Child was not an Indian child.[15] Therefore, at no time

---

15. It is well settled that a tribe is the sole authority that decides its membership. *See In re M.J.*, 2011 UT App 398, ¶ 25 ("The ultimate determination of whether a child is a member or

(continued…)

prior to Child's and Mother's enrollment with the Cherokee Nation in July 2015 were the ICWA placement preferences operative.

¶30 Because Child's placement with her foster family did not violate ICWA, the juvenile court did not abuse its discretion when it considered her bond with her foster family as grounds for good cause to depart from the ICWA placement preferences.[16]

---

(…continued)

eligible to become a member of a particular tribe is the prerogative of that tribe."); *see also Montana v. United States*, 450 U.S. 544, 563 (1981) ("[T]ribes are unique aggregations possessing attributes of sovereignty over both their members and their territory[.]" (citation and internal quotation marks omitted)); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978) ("Indian tribes are distinct, independent political communities, retaining their original natural rights in matters of local self-government." (citation and internal quotation marks omitted)); *Smith v. Babbitt*, 100 F.3d 556, 558 (8th Cir. 1996) ("Indian tribes retain elements of sovereign status . . . . One such aspect of this sovereignty is the authority to determine tribal membership.").

16. We note here that even if it were error for the juvenile court to consider Child's bond with her foster family under the good-cause exception to the ICWA placement preferences, Child's placement at the conclusion of the termination hearing would still be appropriate under ICWA. Although Mother argues that Child's uncle, Grandfather, or any other person enrolled with the Cherokee Nation would be preferred, only Grandfather has petitioned to adopt Child. In *Adoptive Couple v. Baby Girl*, 133 S. Ct. 2552 (2013), the United States Supreme Court held, "[ICWA adoption placement] preferences are inapplicable in cases where no alternative party has formally sought to adopt the child. This is because there simply is no 'preference' to apply if no

(continued…)

## II. Active Efforts

¶31    Mother contends that the termination order should be reversed because the juvenile court erred in determining that the State made active efforts under ICWA by "crediting the State's ICWA expert who was not versed on Cherokee traditions and culture above the Cherokee Nation's ICWA expert."

¶32    ICWA requires the State to make heightened efforts to help the parents of Indian children retain custody. *In re C.D.*, 2008 UT App 477, ¶ 34, 200 P.3d 194 ("[T]he phrase active efforts connotes a more involved and less passive standard than that of reasonable efforts."). ICWA provides,

> Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

25 U.S.C. § 1912(d) (2012). "ICWA does not require expert testimony to support a trial court's finding that active efforts were made to prevent breakup of an Indian family under section

---

(…continued)

alternative party that is eligible to be preferred under § 1915(a) has come forward." *Id.* at 2564. Because Grandfather was the only other person to seek custody of Child, the court's only available options were Grandfather and the foster family. Considering that Grandfather was adjudicated as having neglected Mother in 2010 and that Mother's own expert did not recommend the court return Child to Grandfather due to concerns raised at trial, the juvenile court could have placed Child with her foster family, even without considering the bond cultivated between them.

1912(d)."[17] *In re A.V.*, 2012 COA 210, ¶ 23, 297 P.3d 1019; *see also In re S.A.E.*, 912 P.2d 1002, 1004 (Utah Ct. App. 1996) ("Therefore, the ICWA only requires the State to present qualified expert testimony on the issue of whether serious harm to the Indian child is likely to occur if the child is not removed from the home." (citation and internal quotation marks omitted)).

¶33    Here, Mother does not challenge any of the findings of fact underlying the juvenile court's determination that active efforts were made throughout the case. Nor does Mother contend that the facts on which the juvenile court relied were insufficient to support its determination. She instead argues that the juvenile court improperly disregarded the testimony from her expert witness that active efforts, in his opinion, were not made. Because this argument challenges neither factual findings nor the sufficiency of evidence, on this basis alone we could affirm the juvenile court's conclusion that active efforts were made. *See In re S.D.C.*, 2001 UT App 353, ¶ 20, 36 P.3d 540 (affirming the trial court's conclusion that active efforts under ICWA were satisfied where the father "d[id] not challenge [the trial court's] finding or argue that the evidence supporting the conclusion [was] insufficient"); *see also In re V.H.*, 2007 UT App 1, ¶ 16, 154 P.3d 867 (affirming the juvenile court's conclusion that active efforts were made where the father "failed to properly challenge" the court's findings).

¶34    More important, Mother's argument does not warrant reversal. As explained above, *see supra* ¶ 32, expert testimony is not required to support a court's determination that active efforts were made, nor does the statute require that the evidence be provided by someone "versed on Cherokee traditions and culture," as Mother argues. As a trier of fact, the juvenile court is

17. Failure to provide expert testimony in section 1912(e) foster care placements or section 1912(f) parental termination cases can be grounds for reversal, *see In re A.V.*, 2012 COA 210, ¶ 23, 297 P.3d 1019, but not under section 1912(d).

free to weigh competing expert testimony. *See In re E.R.*, 2001 UT App 66, ¶ 11, 21 P.3d 680 (discussing the wide latitude of discretion given to judgments arrived at by the juvenile court based on the court's firsthand opportunity to judge credibility). And in this case the juvenile court made express findings on the credibility of Mother's expert. Because the testimony of Mother's expert was not entitled to special weight, and because the court found the expert lacked credibility in any event, we see no error in the juvenile court's treatment of the expert testimony.

### III. Motion to Invalidate

¶35 Finally, Mother contends that the juvenile court erred when it denied her motion to invalidate the Custody Order that placed Child in DCFS custody, essentially arguing that Child met the definition of "Indian child" and that ICWA applied at the outset. In Part I, we determined that ICWA did not apply until Mother and Child were enrolled with the Cherokee Nation in July 2015. The same analysis applies here.

¶36 Mother argues, "Child met the definition of an Indian child pursuant to ICWA because she was eligible for membership in the Tribe and the Mother was also obtaining membership." But this argument misstates the definition of Indian child under ICWA. Child did not meet the definition of an Indian child because she was neither "a member of an Indian tribe," nor "eligible for membership in an Indian tribe *and* . . . the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4) (2012) (emphasis added). The fact that Mother was simultaneously seeking membership with the Cherokee Nation did not bring Child within the statutory definition of an Indian child. The Cherokee Nation confirmed that Child was not an Indian child in June 2014, settling any ambiguity as to whether ICWA applied when DCFS took custody of Child.[18] ICWA was

---

18. Again, it is the tribe alone that makes any determination on membership. *Supra* ¶ 29 note 15.

not applicable until July 2015, well after the July 2014 order. *See In re A.G.-G.*, 899 P.2d 319, 321 (Colo. App. 1995) ("Until the party asserting the applicability of the ICWA establishes, on the record, that the child [is an Indian child], the ICWA is not applicable."). Therefore, the juvenile court did not err in denying Mother's motion to invalidate. *See In re adoption of Kenten H.*, 725 N.W.2d 548, 555 (Neb. 2007) (concluding that ICWA applies "prospectively from the date Indian child status is established on the record"); *In re Tucker*, 710 P.2d 793, 796 (Or. Ct. App. 1985) (concluding that a placement order could not be invalidated for failure to comply with ICWA where Indian child status was not established and the court had no reason to know the child was an Indian child until two years after the child was placed in foster care); *cf. In re S.B.*, 30 Cal. Rptr. 3d 726, 732 (Cal. Ct. App. 2005) (rejecting the contention that prior orders should be invalidated pursuant to ICWA where mother did not object on ICWA grounds until just prior to the final termination hearing).

CONCLUSION

¶37   We conclude that the juvenile court could properly rely on the bond between Child and her foster family to find the good cause necessary to deviate from the ICWA placement preferences where Child's initial placement with her foster family was not in violation of ICWA. We further conclude that the juvenile court did not err in disregarding the testimony of Mother's expert. Finally, we conclude that the court did not err when it denied Mother's motion to invalidate the Custody Order because ICWA did not apply.

¶38   Affirmed.

_____