2021 UT App 31

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF A.R.F. AND M.J.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

A.M.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Per Curiam Opinion
No. 20200795-CA
Filed March 18, 2021

Seventh District Juvenile Court, Price Department
The Honorable Craig Bunnell
No. 1156143

Angilee K. Dakic, Attorney for Appellant

Sean D. Reyes, Carol L.C. Verdoia, and John M.
Peterson, Attorneys for Appellee

Martha Pierce, Guardian ad Litem

Before JUDGES GREGORY K. ORME, JILL M. POHLMAN,
and RYAN M. HARRIS.

PER CURIAM:

¶1 A.M. (Mother) appeals the juvenile court order terminating her parental rights, raising three challenges, two of which invoke the Indian Child Welfare Act (ICWA). First, she asserts that the juvenile court erred in determining that there was good cause to deviate from the child placement preferences established by ICWA. *See* 25 U.S.C. § 1915(b). Second, she alleges that the State, through the Division of Child and Family Services (DCFS), failed to make "active efforts" to assist her with

"remedial services and rehabilitative programs designed to prevent the breakup of the Indian family." *See id.* § 1912(d). Third, she challenges the juvenile court's determination that terminating her parental rights was in the children's best interests, and asserts that the court did not adequately consider feasible alternatives to termination and therefore it was not strictly necessary. We reject Mother's arguments and affirm.

BACKGROUND

¶2      In May 2019, after Mother was arrested, DCFS removed teen A.R.F. and toddler M.J. from Mother's custody and initiated a child welfare case. The children were taken into State custody, and eventually placed by DCFS in a local non-Indian foster home. The juvenile court put in place a Child and Family Plan setting forth steps Mother needed to take in order to achieve reunification with the children.[1] This Plan required Mother to, among other things, submit to drug testing, attend drug treatment programs, and maintain gainful employment.

¶3      Mother initially told DCFS that she was not Native American and did not want ICWA procedures applied in her case. Later, however, she said that she believed she might be a member of the Cherokee Nation. Accordingly, the juvenile court set the matter for an ICWA Pretrial Hearing to be held on June 19, 2019. On May 21, as required by the ICWA, DCFS sent notice of the upcoming hearing, along with a copy of the Continued Verified Petition for Custody and the Shelter/Pretrial Order, via registered and certified mail to: (1) the Eastern Band of Cherokee Indians, (2) the Cherokee Nation, and (3) the United Keetoowah Band of Cherokee Indians. *See* 25 U.S.C. § 1912(a) (setting forth

---

1. Only Mother sought reunification. A.R.F. and M.J. have different biological fathers, neither of whom has meaningfully participated in the children's welfare case.

the ICWA notice requirements). On May 23, each of these tribal entities was served with, and signed for, the Notice, Petition, and Shelter/Pretrial Order. Only the Eastern Band of Cherokee Indians responded, advising that Mother and the children were not registered members or eligible to register as members of their tribe.

¶4      After the ICWA Pretrial Hearing, and based on the information that it had at the time, the juvenile court found that the children and Mother were "not members of, and [were] not eligible for enrollment or membership in, a federally recognized Native American Tribe for purposes of [the ICWA]." The court thus concluded that ICWA did not apply.

¶5      Over the next three months, Mother provided no additional information regarding any tribal enrollment to DCFS or the juvenile court. But on September 10, 2019, Mother sent the juvenile court a screenshot of a tribal registration card indicating that she was an enrolled member of the Cherokee Nation. And about a week later, the Cherokee Nation responded to the ICWA notice that DCFS had sent in May and indicated that the children and Mother were "members of, or [were] eligible for enrollment or membership in, the Cherokee Nation for purposes of [the ICWA]." The letter further indicated that a caseworker assigned by the Cherokee Nation would contact DCFS. Thereafter, Mother's DCFS caseworker attempted to contact the assigned caseworker, Mr. Tad Teehee[2] (Tribal Caseworker), to see if he would be participating in the next review hearing, set for October 30, but he did not respond before that hearing.

---

2. Mr. Teehee appeared as a representative of the Indian Child Welfare Department of the Cherokee Nation, which is involved with Indian children coming into state custody to ensure state compliance with ICWA. He has previously testified 1,365 times as an ICWA expert witness in thirty states, including Utah. He is also an attorney licensed in Oklahoma and California.

¶6    At the October 30 hearing, the juvenile court specifically found that "[t]he children and their mother are members of, or eligible for enrollment or membership in, the Cherokee Nation" for purposes of ICWA. The court also found specific needs for continued DCFS custody, additional ICWA placement efforts, and "active efforts" under ICWA to support Mother in rehabilitation and reunification. The court noted that the children were "doing very well" in their DCFS placement in a local non-Indian foster home, which was intended to facilitate visitation with Mother. To implement the ICWA requirements, the court looked for potential placements with relatives or tribal members but found that none "could provide a safe, stable, and otherwise appropriate environment for the children." DCFS stated it would seek input from the Cherokee Nation regarding possible placement with an Indian family, in an effort to meet the priority placement preferences mandated by 25 U.S.C. section 1915(b). As to Mother, the court found that she failed to cooperate with DCFS or treatment providers to meet the court-ordered reunification goals, and that she "continued to show a complete lack of accountability for her actions."

¶7    A few weeks later, DCFS contacted Tribal Caseworker and informed him that the children were not in an ICWA-preferred placement. Tribal Caseworker advised that the Cherokee Nation was not asking for the children to be placed elsewhere because it was unaware of any Cherokee homes available to take the children, and because the children had been placed together in a stable, local foster home that facilitated the services required in the Child and Family Plan. After reviewing the record, Tribal Caseworker participated in a November 2019 family team meeting and spoke with A.R.F. and Mother. Tribal Caseworker advised Mother and the family team that he did not believe the children would be safe in Mother's home or care, so he supported continuing both children in DCFS custody and in their foster placement. Thereafter, Tribal Caseworker continued to regularly communicate with both DCFS and Mother, and also filed a formal Notice of Intervention on behalf of the Cherokee

Nation, pursuant to 25 U.S.C. section 1911(c), signaling his intent to participate in the proceedings and make recommendations as both the ICWA caseworker and the qualified expert for the Cherokee Nation.

¶8    In January 2020, the juvenile court held another review hearing. It found that Mother was noncompliant with the reunification requirements outlined in the Child and Family Plan because she had failed to adhere to the drug testing schedule, find stable employment, or engage in family therapy with A.R.F. DCFS, the Guardian ad Litem, and Tribal Caseworker all recommended that it was in the children's best interests to terminate Mother's reunification services and change the permanency goal to adoption because:

> Mother had failed to cooperate with [DCFS] and treatment providers' recommendations for treatment; she refused to acknowledge any real wrongdoing on her part or show any accountability for her actions; she failed to demonstrate substantial compliance with her Child and Family Plan requirements and the Court's Orders or that she had made any improvement or progress toward remedying the circumstances that led to the children's removal from her custody; and the children had made notable improvements since being in a stable home environment with appropriate and consistent parenting by the [foster parents].

Tribal Caseworker again indicated that there were no Cherokee foster homes available to take the children, but he advised the court that the Cherokee Nation supported the children's continued placement with the foster family, because the children were together, happy, and well-settled in their foster home, they were in the least restrictive placement possible, and A.R.F. wanted to be adopted by the foster family. Tribal Caseworker

further stated that this constituted "good cause" to deviate from the ICWA-preferred placement guidelines in this case, and opined that it was in the children's best interests to allow them to remain in their foster placement. *See id.* § 1915(b) (stating that the ICWA's foster placement preferences shall be applied, "in the absence of good cause to the contrary").

¶9 Based on the evidence before it, the juvenile court first found that DCFS had made "active efforts" to identify family or other tribal members to serve as a placement for the children, but none were identified that were "fit to assume physical custody" and could also "provide a safe, stable, and otherwise appropriate environment for the children." Thus, the court concluded that there was "good cause" to deviate from the ICWA placement preferences. *See id.* Additionally, the court made extensive findings of fact and determined, by clear and convincing evidence, that custody of the children by any of their parents was "likely to result in serious emotional or physical damage" to the children within the meaning of the ICWA. *See id.* § 1912(e) (directing that no foster care placement may be ordered "in the absence of a determination supported by clear and convincing evidence" that "continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child"). Consequently, the juvenile court terminated reunification services and scheduled a permanency hearing for February.

¶10 At the permanency hearing, the juvenile court heard from the parties, received evidence, and took judicial notice of the findings from the January review hearing. The only evidence Mother presented was a forged document she claimed was from her doctor; she provided nothing to overcome the court's prior findings and "continued to be non-compliant with her Child and Family Plan requirements, treatment recommendations, and court orders." The court therefore concluded that additional services were not likely to result in achievement of the objectives of the treatment plan, that reunification was not probable, and

that an extension of reunification services was not in the best interests of the children. The court again concluded that DCFS had engaged in "active efforts" to accomplish the permanency goal of reunification of the family and to provide remedial and rehabilitative services to Mother and the children. Moreover, the court determined that there continued to be a substantial risk of serious emotional or physical damage to the children if they were returned to the custody of their parents. *See id.* Accordingly, the court set the children's primary permanency goal as adoption, with a concurrent permanency goal as permanent custody and guardianship with non-relatives.

¶11   While the termination hearing was pending, Mother continued to have virtual visitation with M.J. In June, Mother requested in-person visitation with M.J. After discussion of COVID-19 concerns related to the health and medical conditions of members of the foster family, the court denied the request and Mother continued weekly virtual visits with M.J.

¶12   At the termination trial, Mother claimed that DCFS violated ICWA requirements by failing to sufficiently investigate certain relatives that she had identified as potential kinship placements. She testified that she provided DCFS with the names and contact information of six relatives: (1) M.J.'s paternal grandmother (Grandmother); (2) a great aunt (Great Aunt); (3) a paternal relative (Paternal Relative 1); (4) a second paternal relative (Paternal Relative 2); (5) M.J.'s paternal grandfather (Grandfather); and (6) Mother's brother (Uncle).

¶13   DCFS contended at the termination trial that none of these relatives provided a viable custody option. Regarding Grandmother, DCFS had investigated Grandmother's living situation and informed her of the necessary steps to obtain an updated background check (BCI check). Grandmother not only failed to take the necessary steps to allow DCFS to obtain the BCI check, but she could not be approved for placement because she lived with an individual who would not pass a BCI check. She

had also failed to follow court orders in another child welfare case, and her professed health issues compromised her ability to provide appropriate care. Great Aunt, with whom Grandmother resided, failed to respond to DCFS or to express an interest in being a kinship placement. Great Aunt could also not be approved for placement because her son resided in her home and he could not pass a BCI check.

¶14 The two paternal relatives were also unsuitable. Paternal Relative 1 did not follow through with the necessary steps to allow DCFS to obtain an updated BCI check, and also did not have a stable home for a kinship study. Paternal Relative 2 was not identified as a potential kinship placement until August 2020, and Mother admitted that she had failed to provide DCFS with any contact information for Paternal Relative 2, who also did not express an interest in being a kinship placement.

¶15 Regarding Grandfather, Mother provided DCFS with his name but failed to provide updated contact information. DCFS sent notice to an old address it had for Grandfather but received no response. In any event, Mother admitted that she did not want Grandfather to be considered as a potential placement for the children because he did not live in Utah.

¶16 And regarding Uncle, Mother said she "thought" she had talked to DCFS about Uncle, but she could not say when or whether she had provided his contact information. And in any event, Uncle told Mother he did not have room for the children and that he did not think he could provide what was necessary to be a kinship placement. Mother also admitted that she did not pursue him as a kinship option because he lived out of state.

¶17 After hearing all the evidence regarding potential kinship placements, the juvenile court found that DCFS made sufficient active efforts to have all of these individuals considered for kinship placement, but due to each of these individuals' lack of

follow-through or other circumstances, DCFS could not approve them as viable placement options.

¶18    Tribal Caseworker also testified at the termination trial. He confirmed that DCFS provided timely notice to the Cherokee Nation under the ICWA and had provided documents to him after he was assigned. Tribal Caseworker recommended a "good cause" deviation from the preferred placements in the ICWA given the status of the case and the stability of the children. *See* 25 U.S.C. § 1915(b). This recommendation was also "based on not having any Cherokee Nation homes available in . . . Utah and not having any other homes that are certified by federally recognized tribes and not having any known family members that were available to take the children." He testified that DCFS had made active efforts under the ICWA to provide rehabilitative services to Mother, which had proven to be unsuccessful. *See id.* § 1912(d). He also stated that he believed that it was in the children's best interests to be adopted by the foster family. He testified that giving Mother additional time would not result in her rectifying the situation that caused the State to take custody of the children. Finally, Tribal Caseworker testified that, due to Mother's continued drug use and pending criminal drug charges (among other things), he believed returning the children to Mother "would likely result in serious emotional, physical damage to the children." *See id.* § 1912(f). Tribal Caseworker testified that Mother's drug use was not culturally appropriate in the Cherokee Nation and can only cause harm to children.

¶19    After considering the evidence, the juvenile court concluded that DCFS "made active, reasonable, and extraordinary efforts to provide remedial services and rehabilitative programs to the parents designed to prevent the breakup of the family pursuant to 25 U.S.C. § 1912(d); however, those efforts have been unsuccessful due to [Mother's] resistance and the barriers she put up throughout the child welfare case." The court also concluded that "[c]ontinued custody of the

children by their parents is likely to result in serious emotional or physical damage to the children pursuant to 25 U.S.C. § 1912(f)." Moreover, it determined that "[g]ood cause has been shown for the continued deviation from the placement preferences outlined in the Indian Child Welfare Act pursuant to 25 U.S.C. § 1915(b)." Finally, the court concluded that it was "strictly necessary from the children's perspective and it is in the children's best interest" for Mother's parental rights to be terminated "so that the children can be adopted and remain in an environment where they will be secure, stable, and protected from further abuse and neglect." The court concluded that it had "considered other permanency options for the children, but finds there are no other appropriate options that will best meet the children's permanency needs." The court then entered an order terminating Mother's parental rights to A.R.F. and M.J.

## ISSUES AND STANDARDS OF REVIEW

¶20 Mother raises three issues on appeal. First, she claims that the juvenile court erred in determining that there was good cause to deviate from the child placement preferences established by the ICWA. *See* 25 U.S.C. § 1915(b). Second, Mother claims that the court erred in determining that the State, through DCFS, satisfied the requirement to make "active efforts" to assist her with remedial services and rehabilitative programs designed to avoid the breakup of an Indian family. *See id.* § 1912(d). Finally, Mother challenges the juvenile court's determination that termination of her parental rights was in the children's best interests and, more specifically, contends that the court did not adequately consider other options besides termination of her parental rights and that therefore termination was not strictly necessary under Utah Code section 78A-6-507(1).

¶21 Termination of parental rights "presents a mixed question of law and fact." *In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435. "We

review the juvenile court's factual findings for clear error and its conclusions of law for correctness, affording the court some discretion in applying the law to the facts." *In re P.F.*, 2017 UT App 159, ¶ 19, 405 P.3d 755 (quotation simplified). Before terminating parental rights, the juvenile court must determine, first, whether statutory grounds for termination are present, and, second, whether termination of the parent's rights is in the child's best interest. *In re B.T.B.*, 2020 UT 60, ¶ 46, 472 P.3d 827. "Because of the factually intense nature of such an inquiry, the juvenile court's decision should be afforded a high degree of deference." *In re B.R.*, 2007 UT 82, ¶ 12. "Thus, in order to overturn the juvenile court's decision, the result must be against the clear weight of the evidence or leave the appellate court with a firm and definite conviction that a mistake has been made." *Id.* (quotation simplified). "When a foundation for the court's decision exists in the evidence, an appellate court may not engage in a reweighing of the evidence." *Id.* "Further, we give the juvenile court a wide latitude of discretion as to the judgments arrived at based upon not only the court's opportunity to judge credibility firsthand, but also based on the juvenile court judges' special training, experience and interest in this field." *In re J.M.*, 2017 UT App 193, ¶ 2, 407 P.3d 1000 (per curiam)(quotation simplified).

ANALYSIS

*I. Good cause to deviate from ICWA's placement preferences*

¶22    Mother first complains that the juvenile court erred in determining that there was good cause to deviate from the ICWA's placement preferences. The ICWA establishes "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes." 25 U.S.C. § 1902. For foster or preadoptive placement of a Native American child, the ICWA provides the following requirements,

In any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with—

(i) a member of the Indian child's extended family;

(ii) a foster home licensed, approved, or specified by the Indian child's tribe;

(iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or

(iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.

*Id.* § 1915(b). "The term 'good cause' is not defined in the statute but was designed to provide state courts with flexibility in determining the disposition of a placement proceeding involving an Indian child." *In re P.F.*, 2017 UT App 159, ¶ 2, 405 P.3d 755 (quotation simplified).

¶23 First, "[w]here the initial placement with a foster family complies with ICWA, there is no reason that a child's bond with her foster family, and the potential trauma inflicted to children who have already suffered abuse or neglect, should not be part of a court's good-cause determination." *Id.* ¶ 25 (quotation simplified). At the outset, Mother denied any tribal membership and, although DCFS provided notice under the ICWA to the Cherokee Nation and the two other federally recognized Cherokee tribes in May 2019, there was no response indicating tribal enrollment. Thus, when the children were initially placed in a non-Indian foster home, it was a proper placement because, at the time, there was no evidence that

they were children who qualified as requiring ICWA-preferred placement. *See id.* ¶ 28. But once Mother and the Cherokee Nation provided notice that the children were members of, or eligible for enrollment or membership in, the Cherokee Nation, DCFS fully cooperated with Tribal Caseworker to ensure proper placement for the children under the ICWA. Tribal Caseworker consistently opined that the children had developed bonds with the non-Indian foster family, and that disrupting the placement would inflict additional trauma. The court also made findings which noted that the children were doing well. Under these circumstances, there exist "grounds for good cause to depart from the ICWA placement preferences." *See id.* ¶ 30.

¶24   Moreover, the record shows that DCFS diligently tried to place the children in ICWA-preferred placements. DCFS actively investigated all possible kinship placements that Mother provided. While Mother claims on appeal that she provided the names of at least four possible kinship placements that DCFS did not sufficiently investigate, the record demonstrates otherwise. DCFS contacted possible kinship placements and the majority of them did not timely respond or take steps to allow them to be considered as placements. In addition, the juvenile court's detailed findings demonstrate that some of those placements could not be approved and Mother was so advised. Although Mother's petition on appeal argues that there could have been placements with relatives or Indian families outside of Utah, Mother consistently resisted placing the children outside of Utah during the child welfare case. Mother also objected to the children being moved to an ICWA-compliant foster home out of the area. And notably, Tribal Caseworker never provided any placement options with Cherokee Nation homes and repeatedly stated that no such placements existed for the children; indeed, he took the position that that good cause existed for deviating from the ICWA's placement preferences and for placing the children outside an ICWA-preferred placement.

¶25    Accordingly, for all of the foregoing reasons, the juvenile court complied with the ICWA's child placement preferences, and did not err in determining that there was "good cause" to deviate from the ICWA placement preferences in this case.

*II. DCFS's active efforts to assist Mother in reunification*

¶26    Next, Mother claims that the juvenile court erred in determining that DCFS made active efforts to provide services to assist her in reunification with her children. The ICWA requires the State to make heightened efforts to help the parents of Native American children retain custody, providing that

> [a]ny party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

25 U.S.C. § 1912(d). "The phrase active efforts connotes a more involved and less passive standard than that of reasonable efforts." *In re C.D.*, 2008 UT App 477, ¶ 34, 200 P.3d 194.

¶27    Mother does not substantively challenge any ground for termination of her parental rights or any of the extensive findings regarding her lack of compliance with the services contained in the Child and Family Plan or court orders. Instead, she generally claims that the services offered to her did not constitute active efforts, but she only identifies lack of in-person—as opposed to virtual—parent-time, which the juvenile court determined was necessary due to COVID-19 concerns. Although Mother could not have in-person parent-time with M.J. during part of the case, this is not sufficient to overcome the substantial evidence of the services that were offered to her by DCFS over an extended period of time. Although Mother

eventually completed the required assessments, she did not complete the recommended treatments and did not consistently undergo drug testing. She denied she had a substance abuse problem and believed that she should not be required to complete any recommended substance abuse treatment. She found online classes that she proposed as the alternative to required classes, although they were not approved services. At one point, Mother even went so far as to forge a document from a medical provider to state that she was physically unable to avail herself of services and needed online classes. Further, she did not provide the documentation requested by DCFS to support her need for accommodation. Based on all of this evidence, the juvenile court determined that the State made "reasonable," "active," and even "extraordinary" efforts to assist Mother. This determination was amply supported by substantial evidence in the record, and was supported by the Cherokee Nation's qualified ICWA expert.

### III. Determination of the children's best interests

¶28 Finally, Mother appeals the juvenile court's determination that it was in the children's best interests and was strictly necessary to terminate her parental rights. Mother essentially claims that the court was required to make findings on specific alternatives to termination and that it did not engage in the required strict necessity analysis.

¶29 A court is required to address the factor of strict necessity as part of its determination of the child's best interest. *See In re B.T.B.*, 2020 UT 60, ¶ 66, 472 P.3d 827. Under Utah law, the best interest analysis starts from the legislatively mandated position that "[w]herever possible, family life should be strengthened and preserved." *See* Utah Code Ann. § 78A-6-503(12) (LexisNexis 2018). "A court may then terminate parental rights only when it concludes that a different option is in the child's best interest and that termination is strictly necessary to facilitate that option. If the child can be equally protected and benefited by an option

other than termination, termination is not strictly necessary." *In re B.T.B.*, 2020 UT 60, ¶ 66. "[W]hen the court considers a child's welfare and best interest, the court's focus should be firmly fixed on finding the outcome that best secures the child's well-being." *Id.* ¶ 64. "Utah law requires courts to analyze whether termination . . . is strictly necessary" and "explore whether other feasible options to termination of parental rights exist that could address the specific issues facing the family." *See In re H.F.*, 2019 UT App 204, ¶ 14, 455 P.3d 1098. "After this consideration, if a juvenile court determines that no such alternatives are available or articulates supported reasons for rejecting alternatives that do exist, such findings are entitled to deference on appeal." *In re C.T.*, 2018 UT App 233, ¶ 16, 438 P.3d 100.

¶30 The juvenile court made extensive findings about the children's progress in the foster and proposed adoptive home. The children were loved and being cared for, their needs were being met, and they had been integrated into the foster family. Mother has not meaningfully challenged these findings. Instead, Mother asserts that the strict necessity analysis was not adequately performed because the court did not make specific findings on other available options. After making the findings regarding the foster and proposed adoptive family's ability to provide a safe, stable, and loving home for the children—and Mother's inability to do so—the court concluded that termination was "strictly necessary from the children's perspective" and that it was in their best interests to terminate parental rights "so that the children can be adopted and remain in an environment where they will be secure, stable, and protected from further abuse and neglect." This conclusion was based on two key findings. First, the court found that additional service options would not be beneficial because Mother consistently refused to comply or made excuses for noncompliance with even "basic requirements." Second, as noted above, the juvenile court had already explored—as part of its duties under the ICWA—the possibility of kinship and other similar placements; indeed, it concluded that it had "considered

other permanency options for the children, but found there are no other appropriate options that will best meet the children's permanency needs." Under these circumstances, the court's findings and determination regarding their best interests and strict necessity are not erroneous under Utah law and were based upon the court's thorough consideration of alternatives. Accordingly, we uphold the court's determination.

## CONCLUSION

¶31　The juvenile court did not err in determining that good cause existed to deviate from the child placement preferences set forth in the ICWA. The court likewise did not err in determining that DCFS made active and sufficient efforts to assist Mother with remedial services and rehabilitative programs. And the court did not err in determining that termination of Mother's parental rights was strictly necessary and in the children's best interests.

¶32　Affirmed.

————————